## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS

FRANK MILLER, *et al.*,

                Plaintiffs,

   v.

CADENCE BANCORPORATION, *et al.*,

                Defendants.

Case No. H-19-3492-LNH

**FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

**JURY TRIAL DEMANDED**

# TABLE OF CONTENTS

NATURE OF THE ACTION AND OVERVIEW ...................................................................... 1

JURISDICTION AND VENUE ............................................................................................... 9

PARTIES ................................................................................................................................. 9

SUBSTANTIVE ALLEGATIONS ........................................................................................ 10

    Background: Cadence's Business .................................................................................. 10

    Cadence Merges With State Bank .................................................................................. 12

    Key Accounting Metrics: Allowance for Credit Losses, Provisions, Charge-Offs .......... 14

    Defendants Failed to Maintain Adequate Loss Reserves in Violation of Applicable GAAP
    Rules ............................................................................................................................. 16

    Defendants Were Aware of Significant Troubled Loans During the Class Period ......... 21

        Heritage Sportswear, Inc. .................................................................................... 21

        Marie Callender's ............................................................................................... 24

        Palm Healthcare Company, Inc. ......................................................................... 27

        Sheridan II .......................................................................................................... 29

    Former Employees Provide Probative Evidence of Cadence's Lack of Adequate Internal
    Controls to Monitor and Respond to Risk, as wells as Increasing Credit Risk Concerns
    that Went Unaddressed During the Class Period .............................................................. 30

    Regulation S-K Required Defendants to Disclose the Inadequacy of Reserves and
    Deteriorating Credit Quality in Cadence's Loan Portfolio ............................................... 32

    Materially False and Misleading Statements Issued During the Class Period .................. 34

    The Truth Begins To Unfold Through A Serious of Partial, Yet Still Misleading, Disclosures 47

ADDITIONAL SCIENTER ALLEGATIONS ........................................................................ 57

    Access to Information and Active Oversight of Credit Risk Management ....................... 57

    Corporate Scienter ........................................................................................................ 60

    Insider Trading .............................................................................................................. 61

    One-Time Executive Bonus Payments Based on Inflated 2018 Performance .................. 63

CLASS ACTION ALLEGATIONS ....................................................................................... 65

APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET) ....... 66

LOSS CAUSATION ................................................................................................. 68

CLAIMS FOR RELIEF ........................................................................................... 69

PRAYER FOR RELIEF ........................................................................................... 72

Plaintiffs Frank Miller and Patrick Gordon ("Plaintiffs"), individually and on behalf of all others similarly situated, by and through their undersigned attorneys, allege the following upon information and belief, except as to those allegations concerning Plaintiffs, which are alleged upon personal knowledge. Plaintiffs' information and belief is based upon, among other things, counsel's investigation, which includes without limitation: (i) review and analysis of regulatory filings made by Cadence Bancorporation ("Cadence" or the "Company") with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (ii) review and analysis of analyst and media reports; (iii) review and analysis of press releases and other public statements issued and disseminated by Cadence or its authorized agents, including the Individual Defendants; (iv) review of other publicly available information concerning Cadence; (v) interviews with former employees of Cadence; and (vi) review of public court dockets of collection actions against, or bankruptcy filings by, certain of Cadence's large commercial lending customers. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION AND OVERVIEW

1.       Plaintiffs bring this class action on behalf of persons and entities that purchased or otherwise acquired Cadence securities between July 23, 2018 and January 23, 2020, inclusive (the "Class Period"), and who were damaged thereby. Plaintiffs seek to pursue remedies against Defendants[1] under the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

2.       Cadence is a financial holding company that focuses primarily on middle-market commercial lending, complemented by retail banking and wealth management services for high net worth customers. The Company's primary asset is its wholly owned subsidiary bank, Cadence Bank, N.A. ("Cadence Bank"), headquartered in Birmingham, Alabama. Cadence Bank provides commercial lending services in Georgia and additional banking services in five southern states: Alabama, Florida, Mississippi, Tennessee, and Texas.

---

[1] Defendants are: Cadence; Paul B. Murphy ("Murphy"), Cadence's Chairman and CEO; and Valerie C. Toalson ("Toalson"), Cadence's CFO.

3.      Cadence's income is derived primarily from interest earned on loans and is thus highly dependent upon the underlying credit quality of its loan portfolio.  In 2017, when Cadence first listed its stock on the New York Stock Exchange (NYSE), it had approximately $7.4 billion in loans; by the beginning of the Class Period, loans had grown to more than $9 billion, of which 63% were Commercial and Industrial ("C&I") loans, and by the end of the Class Period total loans had grown to $13 billion, of which 53% were C&I loans.  As alleged herein, during the Class Period, Defendants misrepresented the true state of the Company's loan portfolio and, in particular, tens of millions of dollars of C&I loans.

4.      One day after the start of the Class Period, on July 24, 2018, Cadence announced a secondary offering of 12,500,000 shares of Class A common stock priced at $28.40 per share, seeking to raise gross proceeds of $355 million from investors, which offering was completed on July 26, 2018.  On August 22, 2018, Cadence stock would reach its Class Period high closing price of $28.85 per share.

5.      On September 11, 2018, the Company announced that it would pursue yet another secondary offering, this time for 12,099,757 shares of Class A common stock priced at $27.55 per share, seeking to raise gross proceeds of an additional $330 million from investors.  This offering was completed on September 14, 2018.

6.      In connection with the September 2018 secondary offering, Defendant Murphy sold 275,000 shares of Cadence stock at an inflated price of $27.41 per share, reaping gross proceeds of over $7.5 million.  Defendant Toalson sold 25,160 shares of Cadence stock at an inflated price of $27.41 per share on September 14, 2018, reaping gross proceeds of $689,636. The Individual Defendants thus collectively reaped over $8 million from selling off Company stock—each of their first and only Cadence stock sales—at inflated prices to unsuspecting investors during the Class Period.

7.      Indeed, unbeknownst to investors, prior to and during the Class Period, Cadence was experiencing significantly deteriorating credit quality in its loan portfolios, failed to timely charge-off bad debt and/or record sufficient loss provisions to reserve against the increasing risk of loss, and had an inadequate allowance for credit losses ("ACL") to reserve against losses in its

key C&I loan portfolios.  For example, over the first eight quarters of Cadence's existence as a public company (Q2 2017 through Q1 2019), Cadence charged off a *total* of $11.1 million of bad debt (an average of $1.39 million per quarter, with the single largest quarter net charge-off of $3.1 million in 3Q 2018.  Over the course of the final three quarters of the Class Period (Q2, Q3, and Q4 2019), Cadence charged off a whopping ***$85.2 million*** in bad debt (an average of ***$28.4 million per quarter***).

8.    As alleged herein, Cadence failed to sufficiently monitor and respond to increasing credit risk during the Class Period, and when employees raised concerns over loan quality and credit risk issues, these concerns were ignored.  In May 2018, Cadence received a regulatory corrective action notice called an MRA (or "Matter Requiring Attention") relating to deficiencies in Cadence's loan origination procedures that Company executives allegedly failed to appropriately address.  As detailed herein, Cadence also entered into repeated and consecutive loan forbearance agreements with borrowers in default, which masked the non-performance of these loans and the overall deterioration of credit in the Company's loan portfolio.

9.    On January 1, 2019, Cadence completed a merger with State Bank Financial Corporation ("State Bank"), a Georgia corporation, with State Bank merging with Cadence, and Cadence surviving the merger (the "State Bank Merger").  The total consideration paid was approximately $826 million consisting solely of Cadence's Class A common stock.  Defendant Murphy described the State Bank Merger as the Company's "fourth and most significant merger" and as "another meaningful step for our organization."  As of December 31, 2018, State Bank had total loans of $3.4 billion, which were acquired by Cadence.  However, only approximately $96 million in loans was recorded as impaired upon Cadence's acquisition (referred to as "ACI," or acquired credit impaired, loans).  As Defendant Toalson noted, the "vast majority" of State Bank acquired loans were recorded by Cadence as non-impaired at acquisition.  With the acquisition of State Bank, however, Cadence acquired more problems with loan quality that it failed to sufficiently monitor and remedy.

10.    During the Class Period, Defendants concealed and failed to disclose to investors material risks the Company was facing in terms of its deteriorating loan portfolio and inadequacy

of reserves.  Defendants misleadingly assured investors that the Company had an effective and conservative internal controls by which the Company actively monitored and responded to credit risk.  Defendants repeatedly assured investors during the Class Period that Cadence employed strict and conservative underwriting standards and credit monitoring that would enable it to weather a recession or economic downturn unscathed.

11.     For example, Cadence hosted its first ever corporate analyst meeting on May 2, 2019 ("Analyst Day"), during which Defendants publicly touted that, unlike its peers, Cadence employed "credit discipline," "proven underwriting criteria," and "strong monitoring of credit," and that as a result, the Company's "[c]redit quality is strong."  Meanwhile, Defendants delayed charging-off bad loans and recorded inadequate provisions against losses (which provisions would be an expense charge against income) to maintain the façade of strong credit quality and to prop up Cadence's reported profits, and its stock price, throughout the Class Period.

12.     During the May 2, 2019 Analyst Day, Defendants diligently (and misleadingly) assured the market of Cadence's credit quality, explicitly attempting to allay concerns about credit risk in the wake of such significant growth in the Company's loan portfolio following the State Bank Merger.  Defendant Murphy explained:

> We're going to go **deep, deep into our credit discipline and our underwriting**, and we recognize that this is something that for many investors is a question mark. They look at us and say fast loan growth means questionable credit quality down the road. I understand. That's a fair question. And **I hope that by the end of the day today, you will see it as I do and feel as comfortable as I feel about where we are with our credit underwriting** and the performance of our team.

13.     Murphy also assured the market that based on extensive due diligence conducted by Cadence, State Bank had "similarly really good credit culture and credit track record." Murphy reiterated that "State Bank putting up good earnings, good credit results, good track record, good trend combining combined with us has been the really reason why we're able to see such nice improvement in all of our ratios in the first quarter."

14.     Defendant Murphy further assured the market that "the way we manage risk, the way we've constructed these portfolios, the way we've built the policies and the credit selection and the monitoring is something that will serve us well in future recessions or downturns of any

type.  And so what you'll see is that the risk control environment, risk infrastructure that we have is built for probably a larger regional bank."  Murphy went so far as to publicly hope for a recession so that he could prove the strength of Cadence's underwriting and the credit quality of the Company's loan portfolios, commenting that "I'm sort of hoping for a recession so we can go through that and perform well and have everyone see that 'I guess what Murphy said all along has proven up.'"

15.     David Black, Cadence's Chief Risk Officer and member of its Senior Credit Risk Management Committee, went on to assure investors as to the Company's "conservative" approach to lending.  In all, Defendants assured investors of the allegedly "conservative" approach Cadence took to loan underwriting and credit risk management at least nine times during the May 2, 2019 analyst meeting.  Steve Prichett, Cadence's Division Head of Technology Banking, closed his remarks by emphasizing: "As we move into 2019, here's what I'd like you to remember: *Credit quality is strong*; *credit quality is strong*, and we continue to see meaningful growth for a strong pipeline."

16.     Investors were thus stunned when, just two months later, on July 22, 2019, the Company disclosed that "higher credit costs including net charge-offs of $18.6 million and loan provisions of $28.9 million" negatively impacted its second quarter 2019 financial results. Defendants cited four credits (*i.e.* loans) as the cause of the charge-offs and three credits as the primary cause of the increased provision.  To put this in perspective, 2Q 2019 net charge-offs were more than *33 times* the previous quarter net charge-offs of $550,000 and more than *13 times* the previous eight-quarter average of $1.39 million per quarter.  On this news, the Company's stock price plummeted by over 20% ($3.75 per share), from $19.61 per share to close at $15.86 per share on July 22, 2019, on extremely heavy trading volume.

17.     Analysts were incredulous that these problematic credit issues were not disclosed and accounted for earlier.  Matthew Olney of Stephens Inc. pressed Defendants in the 2Q 2019 earnings call held the same day: "But as far as the timing, *it seems unusual to see all 7 of these credit issues experience deterioration over the last 50 days or so since the Investor Day*. Is this what you're saying, that it all happened in the last 50 days? Or was there any kind of regulatory

exam that could've also resulted in some of these downgrades?"  Defendant Murphy responded: "The downgrades are -- have no result as of regulatory exams."  Walking back his bombastic Analyst Day assurances that Cadence was uniquely positioned to weather even a recession, Murphy flipped the script, suggesting that analysts misunderstood his incredibly confident credit assurances, commenting: "I guess if at Investor Day, if I left you with the impression that there would not ever be any downgrades, then I've created the wrong impression."

18.     Still, to lessen the blow of the shocking news, Defendant Murphy desperately tried to reassure investors as to the overall health of the Company's loan portfolio, stating that the charge-offs related to only four loans and that "There's no correlation on these 4 credits, and *we don't view this as systemic*."  When pressed further on the cause of the unusually high charge-offs and increased loss provisions by an analyst trying to probe whether the bad loans "are truly one-offs," Defendant Murphy dismissed the occurrence as "***Just a little bit of bad luck*** coming on the heels of the Investor Day," and reiterated that "my view of credit [is] really unchanged. ***Our credit underwriting at Cadence is good.*** We've got a bad quarter here, but all in, still pretty confident with where we are."

19.     Ultimately, analysts accepted—and repeated—Defendants' assurances that the 2Q 2019 credit blow was a one-time hit.  JP Morgan wrote in a July 23, 2019 report that: "we see the keys for the stock to make up some of the lost ground as being (1) ***credit quality pressure being contained to 2Q19*** and (2) NIM performing in-line with expectations provided on the 2Q19 earnings call. ***In other words, <u>no additional negative surprises</u>. To this end, <u>we found the commentary on the call convincing</u> that while the company did see several NPAs as well as several NCOs pressure 2Q results, these appear to be idiosyncratic and <u>not indicative of broader pressure mounting on the loan portfolio</u>*."  Based on management's assurances, JP Morgan thus retained its "Overweight" rating (*i.e.*, JP Morgan continued to view the stock as a better value for the money than others).

20.     However, Defendants' misleading assurances of Cadence's credit quality would be proven false in short order.  Far from no additional negative surprises, investors would learn the situation was, in fact, exponentially worse than they were led to believe on July 22, 2019.  On

October 23, 2019, the Company disclosed that "for the second quarter in a row, we incurred elevated charge-offs and higher provisions, primarily driven by a small number of existing nonperforming credits that experienced further deterioration." More specifically, the Company reported "Net charge-offs of $31.3 million, an increase of $12.7 million" and "Provision for credit losses of $43.8 million, an increase of $14.8 million." These figures dwarfed even the already shocking amounts reported the quarter before. JP Morgan reported that "the miss was primarily driven by ***provision expense being reported $35mm above forecast***" and noted that the "[p]rovision expense was elevated tied to a combination of charge-offs of previously identified problem credits as well as continued negative credit migration." On this news, the Company's stock price fell $2.23 per share, or over 13%, to close at $15.74 per share on October 23, 2019, thereby further injuring investors.

21.     Yet again, however, Defendants continued to misrepresent and conceal the true extent of the problems by misleadingly assuring investors that the troubled loans were, again, one-offs rather than any broader problem with the Company's loan portfolio. Defendant Murphy stated: "we experienced another quarter of elevated charge-offs, and we've taken provisions higher as a result of some pressure we're seeing in certain pockets of our portfolio. I think ***it's significant to note that the predominance of our elevated credit calls stand from a few loans that hit us really hard [as] opposed to a broad-based deterioration***."

22.     Finally, on January 23, 2020, Defendants delivered yet another blow. Cadence yet *again* disclosed elevated net charge-offs of $35.3 million and provisions of $27.1 million for 4Q 2019, resulting in disappointing 4Q and year-end 2019 results. The Company explained that "[t]he current quarter charge-offs included $15.0 million in five restaurant credits, $7.7 million in three general C&I credits, $7.5 million in three energy credits and $4.3 million in three acquired credits." On this news, the Company's stock price fell $1.31 per share, or over 7%, to close at $16.34 per share on January 23, 2020, thereby further injuring investors.

23.     In all, over three consecutive quarters, Cadence charged-off a whopping $85.2 million in bad loans—more than fourteen (14) times the total amount of net charge offs ($5.9 million) for all of 2018. In addition, over the same three consecutive quarters, Cadence recorded

loss provision expenses of nearly $100 million—more than seven and a half (7.5) times the total provisions recorded for all of 2018 ($12.7 million)—to replenish reserves lost to the elevated charge-offs and to further reserve against (albeit insufficiently) the deteriorated loan portfolio.

24.     This amount of commercial loans do not go bad overnight, and Defendants' feigned surprise in the face of these massive and repeated charge-offs, and suggestion that Cadence was merely on the wrong end of some "bad luck" borrowers is simply not credible. Instead, it supports a strong inference that Defendants intentionally or recklessly slowed the "migration" of loans (*i.e.*, delayed downgrading their internal credit ratings on troubled loans), and delayed the amount of provision expense and net charge-offs, in order to control and smooth earnings so that the full extent of the bad credit hit would not be felt at once.   Instead, Defendants knowingly or recklessly spread the bad news out over three quarters (so far).  At a minimum, it demonstrates Defendants' extreme recklessness with respect to the credit risks present in Cadence's loan portfolio during the Class Period.  This enabled Defendants to keep Cadence's stock price artificially high (i) to support the 2018 secondary offerings—from which the Individual Defendants profited handsomely, to the tune of in excess of $8 million, and (ii) to support the all stock purchase of State Bank.

25.     Cadence's deteriorating credit quality, the need for increased charge-offs and provisions (that should have been taken but were delayed), and inadequacy of reserves was a known trend or uncertainty reasonably likely to have a material unfavorable impact on Cadence's financial performance that should have been disclosed to investors.[2]

26.     Throughout the Class Period, Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants misrepresented and failed to disclose to investors: (1) that the Company lacked adequate internal controls to assess and respond to credit risk; (2) that, as a result, the Company's loan portfolios presented an undisclosed increased risk of loss; (3) that, as a result, the Company was reasonably likely to incur significant losses; (4)

---

[2] 17 C.F.R. § 229.303(a)(3)(ii).

that the Company's financial results would suffer a material adverse impact; and (5) that, as a result of the foregoing, Cadence's financial reporting and Defendants' positive statements about Cadence's credit quality and internal controls were materially misleading.

27.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

28.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

29.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

30.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)).  Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.  Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District. In addition, the Company's principal executive offices are located in this District.

31.     In connection with the conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

32.     Plaintiff Frank Miller, as set forth in the previously-filed certification, incorporated by reference herein, purchased Cadence securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

33.     Plaintiff Patrick Gordon, as set forth in the previously-filed certification, incorporated by reference herein, purchased Cadence securities during the Class Period, and

suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

34.     Defendant Cadence is incorporated under the laws of Delaware with its principal executive offices located in Houston, Texas.  Cadence's Class A common stock trades on the NYSE under the symbol "CADE."

35.     Defendant Murphy was the Chairman and CEO of Cadence at all relevant times.

36.     Defendant Toalson was the CFO of the Company at all relevant times.

37.     Defendants Murphy and Toalson (collectively the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of Cadence's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.  The Individual Defendants were provided with copies of Cadence's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.  The Individual Defendants are liable for the false statements pleaded herein.

## SUBSTANTIVE ALLEGATIONS

### Background: Cadence's Business

38.     Cadence is a financial holding company that focuses on middle-market commercial lending, complemented by retail banking and wealth management services, and provides banking services to businesses, business owners, and high net worth individuals.

39.     According to Cadence's Form 10-K/A for 2018, filed March 8, 2018 ("2018 Form 10-K/A"), its "Commercial Banking line of business includes a general business services component primarily focusing on commercial and industrial ('C&I'), community banking, business banking and commercial real estate lending and treasury management services to clients in our geographic footprint in Texas and the southeast United States."  Cadence explained that its

Banking Segment represented approximately 90% of the Company's total revenues for the three years in the period ended December 31, 2018.

40.     The Company further explained that "[t]he largest component of our net income is net interest income, which is the difference between the income earned on interest-earning assets and interest paid on deposits and borrowings."  In turn, "[i]nterest earned on our loan portfolio is the largest component of our interest income."  In short, the performance of Cadence's loan portfolio was critical to the Company's overall financial performance, and thus a core operation of the Company.

41.     Cadence further explained that banking segment expenses "includes all interest expense on our deposit accounts and other bank liabilities, operational and administrative expenses related to the business conducted in this segment and the provision for credit losses on our loan portfolio."  In other words, provisions taken to build credit reserves to protect against potential loan losses are recorded as expenses charged against the Company's net income.

42.     As of December 31, 2018, C&I loans represented nearly 62% of the Company's total loan portfolio.  Other loan categories included consumer loans and small business loans.  In turn, Cadence divides its C&I loans into four primary sectors: General C&I; Energy; Restaurant; and Healthcare.  Cadence describes its General C&I loans as follows: "As of December 31, 2018, our general C&I category included the following types of loans: finance and insurance, professional services, commodities excluding energy, media and telecom, real estate, manufacturing, transportation and other.  Generally, C&I loans typically provide working capital, equipment financing and financing for expansion and are generally secured by assignments of corporate assets including accounts receivable, inventory and/or equipment."

43.     Cadence also maintains a portfolio of shared national credit ("SNC") loans.  SNC loans are syndicated loans in an aggregate amount of $100 million or more that a group of lenders, working in tandem, provides for a single borrower.  SNC loans are overseen by the Federal Deposit Insurance Corporation ("FDIC"), the U.S. Federal Reserve, and the Office of the Comptroller of the Currency ("OCC").  As of December 31, 2018, 89.2% of Cadence's SNC loan portfolio resided in the Company's C&I loan segment.

### Cadence Merges With State Bank

44.     Approximately two months prior to the Class Period, on May 11, 2018, the Company entered into an Agreement and Plan of Merger (the "Merger Agreement") with State Bank. The Merger Agreement provided that State Bank would merge with Cadence, with Cadence surviving the State Bank Merger.  On January 1, 2019, Cadence completed the State Bank Merger.  The total consideration paid was approximately $826 million consisting solely of Cadence's Class A common stock.

45.     On July 25, 2018, the Company filed a Form 424B3 (Prospectus) relating to the State Bank Merger.  In the Prospectus, Cadence described purportedly extensive due diligence efforts conducted in connection with the State Bank Merger.  For example, Cadence stated: "on April 25, 2018, Cadence's board of directors held a meeting to review with Cadence management the status of discussions with State Bank and Cadence's ongoing due diligence investigations with respect to State Bank"; "On May 2, 2018, the M&A committee of Cadence's board of directors held a meeting to review with Cadence management the status of discussions with State Bank and receive an update on Cadence's ongoing due diligence investigations with respect to State Bank"; "On May 7, 2018, Cadence's board of directors held a meeting that was also attended by representatives of Wachtell Lipton and Goldman Sachs & Co. LLC, . . . to review the status of discussions with State Bank, the outcome of Cadence's due diligence investigations with respect to State Bank."  Finally, on May 8, 2018, "Cadence indicated that it had completed its due diligence and that it was ready to immediately approve and execute the merger agreement."

46.     In a January 28, 2019 Cadence press release, Defendants touted the State Bank Merger. Defendant Murphy is quoted as saying of the merger: "While we are very proud of 2018, we are excited as we look toward 2019 having closed the State Bank merger on January 1, 2019. The closing of our fourth and most significant merger is another meaningful step for our organization."  The press release reported that as of December 31, 2018, State Bank had total loans of $3.4 billion, which were acquired by Cadence.

47.     In the Company's 1Q 2019 Form 10-Q, filed on May 10, 2019, Defendants stated

that "[o]ur recent merger with State Bank added approximately $96 million in ACI [acquired credit impaired] loans to our portfolio." The Company's financial reporting further reflected a $25 million increase in General C&I and a $1.5 million increase in Restaurants.  Significantly, as Defendant Toalson noted during the Company's 1Q 2019 earnings call, "the vast majority of the loans that we acquired from State Bank are noncredit-impaired category."

48.     According to the Company's 2018 Form 10-K/A, "acquired loans are recorded at fair value with no credit loss allowance on the date of acquisition. A provision for credit losses is recorded in periods after the date of acquisition for the emergence of new probable and estimable losses on acquired non-credit impaired ("ANCI") loans. A provision for credit losses is recognized on our [acquired credit impaired] ACI loans after the date of acquisition based on the re-estimation of expected cash flows."

49.     In the Company's 2018 Form 10-K, filed on March 1, 2019 (the "2018 Form 10-K"), Cadence explained that "[t]he Company accounts for its acquisitions under ASC Topic 805, which requires the use of the acquisition method of accounting. All identifiable assets acquired, including loans, are recorded at fair value."  Thus, Cadence was required to conduct a loan-level review of all of the loans acquired from State Bank to ascertain fair value prior to recording them on Cadence's books.

50.     The FDIC has instructed that merger "[d]ue diligence is the primary responsibility of the Board and senior management. However, the depth and scope require the involvement of key personnel, including the Compliance Officer, auditors, and department supervisors throughout the merger or acquisition process. An effective merger due diligence process helps ensure the surviving institution's consumer compliance posture is maintained during and after a merger or acquisition, as it gives the Board and senior management the information it needs to allocate personnel resources in compliance and operational areas."[3]

51.     During the May 2, 2019 analyst day, Cadence assured investors that "State Bank

---

[3] *available at*
https://www.fdic.gov/regulations/examinations/supervisory/insights/sisum13/sisummer13-article02.pdf

similarly [had] really good credit culture and credit track record."  The Company reiterated that "the credit here, *we did extensive credit diligence on the front end* [of the State Bank Merger], and I'm pleased to report that so far *our credit diligence is really holding up*. *The credit performance at State Bank is performing as expected*."  Murphy also stated that with "State Bank putting up good earnings, good credit results, good track record, good trend combining combined with us has been the really reason why we're able to see such nice improvement in all of our ratios in the first quarter."

### Key Accounting Metrics: Allowance for Credit Losses, Provisions, Charge-Offs

52.     A critical metric of any banking institution, including Cadence, is the allowance for credit losses ("ACL"), which represents the amount of reserve that banks are required to maintain to protect against impaired loans and other credit instruments, such as lines of credit.

53.     Cadence explained in its 2018 Form 10-K/A that ACL "is maintained at a level that management believes is adequate to absorb all probable losses on loans inherent in the loan portfolio as of the reporting date. Events that are not within the Company's control, such as changes in economic factors, could change subsequent to the reporting date and could cause increases or decreases to the ACL. The amount of the allowance is affected by loan charge-offs, which decrease the allowance; recoveries on loans previously charged-off, which increase the allowance; and the provision for credit losses charged to earnings, which increases the allowance."

54.     Closely related to the ACL is the associated provision for losses, which takes the form of a charge against earnings (thereby decreasing net income), and is assessed on a quarterly basis in order to maintain the ACL at an appropriate level in relation to the bank's overall credit portfolio and credit risks.  For example, as the risks of an underlying credit portfolio increase, a provision must be taken in the form of a charge against earnings to increase the overall ACL in reserve.

55.     Cadence explained in its 2018 Form 10-K/A that "[t]he provision for credit losses is based on management's quarterly assessment of the adequacy of our allowance for credit losses ("ACL") which, in turn, is based on such factors as the composition of our loan portfolio

and its inherent risk characteristics, the level of nonperforming loans and net charge-offs, both current and historic, local economic and credit conditions, the direction of collateral values, and regulatory guidelines. The provision for credit losses is charged against earnings in order to maintain our allowance for credit losses, which reflects management's best estimate of probable losses inherent in our loan portfolio at the balance sheet date."

56.     A charge-off should occur when a debt, or portion of a debt, is unlikely to be collectible.  The charge-off of a loan decreases the overall ACL.  The net charge-off ("NCO") is the dollar amount representing the difference between the total charge-offs and any subsequent recoveries of delinquent debt.   In other words, net charge-offs refer to the debt owed to a company that is unlikely to ever be recovered by that company.  According to Cadence's 2018 Form 10-K, "Loans within the commercial portfolio are generally evaluated for charge-off at 90 days past due, unless both well-secured and in the process of collection."

57.     Cadence also purported to track credit risk by grading loans as "criticized" (loans for which one or more potential or defined weaknesses exits) or "classified" (loans for which one or more defined weakness exists).  In Cadence's 2018 Form 10-K, the Company purported to describe its Credit Risk Management ("CRM") system as follows, in pertinent part:

> The assignment of commercial risk ratings is done on a transactional basis using scorecards. We use a total of six different scorecards that accommodate various areas of lending. Each scorecard contains two main components: probability of default ("PD") and loss given default ("LGD"). Each component is assessed using a multitude of both qualitative and quantitative scoring elements, which will generate a percentage for each component. The key elements assessed in the scorecard for PD are financial performance and trends as well as qualitative measures. The key elements for LGD are collateral quality and the structure of the loan. The PD percentage and LGD percentage are converted into PD and LGD risk ratings for each loan. The PD is used as our grade of record, while the LGD is utilized in both our allowance estimate as well as pricing model. Loans with PD ratings of 1 through 8 are loans that we rate internally as "Pass." Loans with PD ratings of 9 through 13 are rated internally as "Criticized" and represent loans for which one or more potential or defined weaknesses exits. Loans with PD ratings of 10 through 13 are also considered "Classified" and represent loans for which one or more defined weakness exists. These classifications are consistent with regulatory guidelines.

58.     Cadence separately defined non-performing assets ("NPA") or nonperforming loans as "Commercial loans, including small business loans, are generally placed on nonaccrual

status when principal or interest is past due 90 days or more unless the loan is well secured and in the process of collection, or when the loan is specifically determined to be impaired. When a commercial loan is placed on nonaccrual status, interest accrued but not received is generally reversed against interest income."

**Defendants Failed to Maintain Adequate Loss Reserves in Violation of Applicable GAAP Rules**

59.     Generally Accepted Accounting Principles ("GAAP") are the authoritative standards, interpretations, rules and underlying concepts established and relied on in the United States as the best and most reliable financial reporting and accounting practices.  Regulation S-X, to which Cadence is subject as a registrant under the Exchange Act, provides that annual and interim financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, regardless of accompanying disclosures. *See* 17 C.F.R. § 210.4-01(a)(1) and § 210.10-01(a), as to annual and interim financial statements, respectively.

60.     The SEC recognizes the financial reporting and accounting standards of the Financial Accounting Standards Board ("FASB") as GAAP. *See* SEC Release Nos. 33-8221; 34-47743; FR-70. SEC Rule 12b-20 requires that periodic reports contain such further information as is necessary to make the required statements, in light of the circumstances under which they are made, not misleading.

61.     Management is solely responsible for preparing financial statements that comply with GAAP. Public Company Accounting Oversight Board ("PCAOB") Auditing Standard No. 1, AS § 1001.03, *Distinction between Responsibilities of Auditor and Management*; *see also* Sarbanes-Oxley Act of 2002, §§ 302, 401 and 404.

62.     Under GAAP, accounting for losses on lending activities are governed by ASC 450, *Contingencies*, and ASC 310, *Receivables*, and related literature.  A loss contingency is an existing condition, situation or set of circumstances involving uncertainty as to possible loss. FASB ASC, *Master Glossary*. The assets of an enterprise may include receivables that arose from credit sales, loans, or other transactions. "The conditions under which receivables exist usually involve some degree of uncertainty about their collectability, in which case a

contingency exists." *See* ASC 310-10-35-7, *Losses From Uncollectible Receivables*.

63.     Under GAAP, financial institutions like Cadence must evaluate and reevaluate loans for impairment, and must maintain a sufficient reserve against loan losses.  The loss must equal the amount of probable loss that can be reasonably estimated (*i.e.*, where "it is probable that the creditor will be unable to collect all the contractual interest and principal payments as scheduled in the loan agreement").  ASC 310-10-35-2.  This is one of the most critical steps in the ACL (allowance for credit losses) calculation process.  It also directly impacts a firm's financial performance because recording a provision (adding to the firm's ACL reserves) is recorded as an expense which reduces net income.

64.     GAAP requires that estimated losses from loss contingencies be accrued by a charge against income when a loss is both probable and reasonably estimable.  ASC 450-20-25-2.  Loans are explicitly subject to ASC 450. *Id.*

65.     ASC-450-20-25 applies to the recognition of an expense in the form of a loss provision.  It provides:

> An estimated loss from a loss contingency ***shall*** be accrued by a charge to income if both of the following conditions are met:
>
> a.     ***Information available*** before the financial statements are issued or are available to be issued (as discussed in Section 855-10-25) ***indicates that it is probable that an asset had been impaired*** or a liability had been incurred at the date of the financial statements. Date of the financial statements means the end of the most recent accounting period for which financial statements are being presented. It is implicit in this condition that it must be probable that one or more future events will occur confirming the fact of the loss.
>
> b.  The amount of loss can be ***reasonably estimated***.
>
> The purpose of those conditions is to ***require accrual of losses when they are reasonably estimable and relate to the current or a prior period***.

66.     In calculating Cadence's loan loss provisions, Defendants were thus required to consider the declining value of the collateral underlying its loans. Cadence's management should have reviewed all troubled loans to evaluate the current market values of the underlying collateral to arrive at estimated impairment losses. FASB Emerging Issues Task Force, in EITF Topic No. D-80, states that "[a]n institution should ensure that an appraisal of collateral reflects a

realistic estimate of fair value, which takes into consideration the time it will take the institution

to realize the value of the collateral and current market conditions for selling the collateral."

67.     For public companies like Cadence, among the most important related literature is

FRR.T.401.09, *Accounting for Loan Losses by Registrants Engaged in Lending Activities*, as set

forth in SEC Financial Reporting Release No. 28 ("FRR 28"), *Accounting for Loan Losses by

Registrants Engaged in Lending Activities*. FRR 28 goes well beyond the GAAP literature,

prescribing a detailed and systematic reserve-setting methodology, along with policies and

procedures that SEC registrants must abide by when assessing and recording expected loan

losses.   FRR 28 sets expectations and provides numerous directives intended to achieve a

consistent, reliable, and comparable methodology for loss estimates. Writing off loans when they

go bad removes the bad loan and the related allowance for credit losses from Cadence's balance

sheet.  As discussed herein, however, Cadence avoided timely writing-off bad loans prior to and

during the Class Period.  In failing to timely write off bad loans, Cadence created the appearance

of a sufficiently large ACL in relation to the Company's total portfolio, such that it improperly

reflected the existence of reserves that, in fact, would not be sufficient to cover the true extent of

loans in the portfolio that were probable to go bad.  At the same time, Cadence avoided timely

recording sufficient provision expense to reserve against probable losses on troubled loans,

further rendering the overall ACL insufficient in comparison to the total size and underlying

risks in the portfolio.

68.     During the Class Period, Cadence's ACL was both (i) grossly inadequate from

inadequate loan loss provisioning and (ii) materially inflated because bad loans had not been

timely written off.   By the second quarter of 2019, Cadence could no longer conceal its

knowledge that a significant amount of loans in its C&I portfolio were impaired and would need

to be charged-off. However, because Cadence had not taken sufficient loss provisions in prior

periods even though Defendants acknowledge that the loans were "previously designated as

impaired," and because much of the reported ACL was needed for prior losses that had not been

timely written off, Cadence's allowance at the time was insufficient. Thus, in the second quarter

of 2019, Cadence recorded a loss provision of $28.9 million to replenish its ACL in the face of

net charge-offs of $18.6 million and additional impaired loans that it could no longer ignore.

69.     Still, in its 2Q 2019 reporting, however, Cadence continued to hide the extent of the bad loans from investors by failing to charge-off the full extent of bad debt, and by failing to record a sufficient loss provision.  The Company was thus forced to admit as much at the end of Q3 2019, stating that "for the second quarter in a row, we incurred elevated charge-offs and higher provisions, primarily driven by a small number of existing nonperforming credits that experienced further deterioration."  Thus, in 3Q 2019, Cadence recorded a provision of $43.8 million, in part, to replenish its ACL in the face of net charge-offs of $31.3 million.   Defendants admitted that $15 million of the $31.3 million charge-off related to the same loan for which the Company had charged-off $5 million the prior quarter.  The trend continued for a third quarter, with Cadence recording a loss provision of $27.1 million to reserve against still more troubled loans and to replenish its ACL in the face of net charge-offs of $35.3 million in 4Q 2019.

70.     The below table sets forth Cadence's total loans, net charge-offs, ACL, and loss provisions from Q1 2017 through the end of the Class Period.  As reflected in the table, charge-offs and provisions failed to keep pace with loan growth prior to and during the Class Period; both charge-offs and loss provisions were kept artificially low in relation to both increasing portfolio size and deteriorating credit health.  As such, the Company's overall ACL failed to keep pace with the growing loan portfolio size and increasing credit risk:

| Quarter | Total Loans | Net Charge-Off | Net Charge-Off to Total Loans Ratio (in Basis Points) | ACL | ACL to Total Loans Ratio (in Basis Points) | Loan Loss Provision | Loan Loss Provision to Total Loans Ratio (in Basis Points) |
|---|---|---|---|---|---|---|---|
| 1Q17 | $7,561,472,000 | $250,000 | -0.33 | $88,304,000 | 116.78 | $5,786,000 | 7.65 |
| 2Q17 | $7,716,621,000 | ($1,790,000) | 2.32 | $93,215,000 | 120.80 | $6,701,000 | 8.68 |
| 3Q17 | $8,028,938,000 | ($173,000) | 0.22 | $94,765,000 | 118.03 | $1,723,000 | 2.15 |
| 4Q17 | $8,253,427,000 | ($2,714,000) | 3.29 | $87,576,000 | 106.11 | ($4,475,000) | -5.42 |
| 1Q18 | $8,646,987,000 | ($419,000) | 0.48 | $91,537,000 | 105.86 | $4,380,000 | 5.07 |
| 2Q18 | $8,975,755,000 | ($2,180,000) | 2.43 | $90,620,000 | 100.96 | $1,263,000 | 1.41 |
| July 23, 2018: Class Period starts (announcement of 2Q 2018 results) | | | | | | | |
| 3Q18 | $9,443,819,000 | ($3,104,000) | 3.29 | $86,151,000 | 91.22 | ($1,365,000) | -1.45 |
| 4Q18 | $10,053,923,000 | ($195,000) | 0.19 | $94,378,000 | 93.87 | $8,422,000 | 8.38 |
| January 1, 2019: Cadence merges with State Bank (acquired $3,354,000,000 in loans) | | | | | | | |
| 1Q19 | $13,624,954,000 | ($550,000) | 0.40 | $105,038,000 | 77.09 | $11,210,000 | 8.23 |
| 2Q19 | $13,627,934,000 | ($18,620,000) | 13.66 | $115,345,000 | 84.64 | $28,927,000 | 21.23 |
| 3Q19 | $13,637,042,000 | ($31,336,000) | 22.98 | $127,773,000 | 93.70 | $43,764,000 | 32.09 |
| 4Q19 | $12,983,655,000 | ($35,256,000) | 27.15 | $119,643,000 | 92.15 | $27,126,000 | 20.89 |

71.     As the above table reflects, In both 4Q 2017 and 3Q 2018, despite the growing portfolio and increasing underlying credit risk, Cadence actually *reversed* loss provisions (thereby reducing overall reserves).   The table further reflects that over the first eight quarters of Cadence's existence as a public company (Q2 2017 through Q1 2019), Cadence charged off a *total* of $11.1 million of bad debt (an average of $1.39 million per quarter, with the single largest quarter net charge-off of $3.1 million in 3Q 2018).   Then, over the course of the final three quarters of the Class Period (Q2, Q3, and Q4 2019), Cadence charged off a whopping ***$85.2 million*** in bad debt (an average of ***$28.4 million per quarter***).

72.     The below chart exhibits the sudden and drastic increase in both charge-offs and provisions in the final three quarters of the Class Period, as a result of Cadence's insufficient reserves and delayed charge-offs prior to and in the earlier quarters of the Class Period.   As reflected in the chart, charge-offs and provisions during 1Q 2017 through 1Q 2019 were relatively flat before spiking in Q2, and staying at extremely elevated levels in Q3 and Q4:



73.     The above table and chart illustrate the extent to which Cadence insufficiently reserved and delayed charging off bad loans, which resulted in drastically increased charge-offs and provisions in the final three quarters of 2019.   Moreover, as alleged herein, Defendants knew or recklessly disregarded the true extent to which bad debt should have been charged-off and/or troubled debt provisioned against when they took their the first big charge-offs and provisions in 2Q.   Instead, Defendants attempted to spread the bad news out over three quarters in order to

smooth the Company's earnings results. Specific loans which it appears Cadence failed to timely charge-off or record sufficient provisions against are detailed herein.

74. As a result of delayed charge-offs and insufficient reserves and loss provisions, Cadence's public financial statements and related earnings releases during the Class Period were materially misstated and in violation of GAAP. Defendants materially overstated Cadence's net interest income and net income by improperly accounting for its loans and committing other GAAP violations. More specifically, on a quarterly basis, Cadence failed to record adequate loan loss provisions (expenses), which overstated income. Cadence's allowance for credit losses (reserves) was much too small to absorb expected losses, which overstated Cadence's loan values and stockholders' equity.

75. Cadence's improper accounting totaled tens of millions of dollars and affected the most important accounting metrics monitored by investors and analysts of bank holding companies. On the income statement: interest income, interest expenses, net income, loan loss provisions; on the balance sheet: loan loss reserves, net asset values and shareholders' equity, along with associated rates of return and loss. If Defendants had complied with GAAP, Cadence's reported Class Period financial results would have been materially different.

**Defendants Were Aware of Significant Troubled Loans During the Class Period**

**Heritage Sportswear, Inc.**

76. One of the commercial loans acquired by Cadence in the State Bank Merger involved Heritage Sportswear, Inc. ("Heritage"), a supplier of blank apparel in the promotional products industry, including items such as t-shirts, pullovers, hats and other athletic items.

77. On February 16, 2017, Heritage Sportswear entered into a loan and security agreement (as amended from time to time, "Heritage Loan Agreement") with AloStar Bank[4] of Commerce, Presidential Financial Corporation, and Woodforest National Bank (collectively, the

---

[4] State Bank and Trust Company became the successor-by-merger to AloStar Bank of Commerce and Cadence Bank became the successor-by-merger to State Bank and Trust Company. As a result of these mergers, Cadence Bank is now one of three lenders, including Presidential Financial Corporation, and Woodforest National Bank (collectively, the "Heritage Lenders") with Cadence as the agent for all the Heritage Lenders.

"Heritage Lenders"), under which the Heritage Lenders made revolving credit loans to, and extended other financial and credit accommodations to or for the benefit of Heritage. The Heritage Loan Agreement shows a total commitment of $55 million, with AloStar responsible for advancing $20 million, or 36.4%, of the $55 million total loan.

78.     Within months of the commencement of the loan, Heritage breached numerous financial covenants set forth in the February 16, 2017 loan agreement, including, but not limited to the facts that Heritage:

     a.   failed to achieve sufficient EBITDA for the period of four months ending May 31, 2017;

     b.   made improper payments to subordinated creditors and sellers;

     c.   failed to timely deliver financial statements to the Heritage Lenders;

     d.   failed to timely deliver a file-stamped UCC-3 amendment authorized by Gildan Activewear SRL, a Heritage supplier that maintained consignment inventory on Heritage's leased property;

     e.   failed to timely deliver lien waivers to the Heritage Lenders with respect to certain locations where collateral was located; and

     f.   failed to timely deliver a collateral assignment of Michael Jordan's life insurance policy to the Heritage Lenders.

79.     On July 12, 2017, Heritage was formally notified, by letter, of each of the events of default that had occurred since the inception of the Heritage Loan Agreement. Following this formal notification, however, the Heritage Lenders continued to make advances under the Heritage Loan Agreement.

80.     Following the occurrence of the initial default events, and amidst the Heritage Lenders seeking to have Heritage address the existing default events, Heritage continued to experience major issues with running its business including, significant cash flow deficits, the inability to raise sufficient additional capital, and the abrupt resignation of its CEO and

Chairman on September 17, 2018.[5]

81.     Following the resignation of Heritage's CEO and Chairman, Heritage engaged the services of an investment banking company in order to either obtain a sale or refinancing of the business sufficient to repay Heritage's obligations to the Heritage Lenders in full.  Heritage requested the Heritage Lenders to continue to make advances in order to fund the marketing process required for the potential sale, and maintained that if the marketing process was unsuccessful that Heritage would cooperate with the Heritage Lenders and conduct an orderly liquidation of Heritage's assets as repayment of its debt obligation.  The marketing process was unsuccessful and was abandoned after three months.  All of these events took place during the same timeframe that Cadence was supposedly conducting thorough due diligence of State Bank's loans leading up to the closing of the State Bank Merger on January 1, 2019.

82.     Cadence acquired the Heritage loan in the State Bank Merger on January 1, 2019. Shortly thereafter, in light of Heritage's continued violation of the Heritage Loan Agreement covenants and Heritage's failed marketing efforts, Cadence commenced the process for a private foreclosure sale under Article 9 of the Uniform Commercial Code, which proved unsuccessful due in part because of Heritage's unwillingness to cooperate with an interested buyer.

83.     On February 1, 2019, Cadence filed a *Verified Complaint for Damages, Appointment of a Receiver, and Injunctive Relief* in the U.S. District Court of the Northern District of Georgia to collect under the Heritage Loan Agreement.  *See Cadence Bank, N.A., v. Heritage Sportswear, Inc.*, Case No. 1:19-cv-00595-JPB (N.D. Ga. 2019).

84.     Cadence's complaint against Heritage sought, *inter alia*, a judgment for monetary damages in the principal amount of $33,433,607.58 collectively to Heritage's three lenders (the approximate amount of outstanding principal as of February 1, 2019), plus: (i) accrued, but unpaid pre-judgment interest, (ii) attorneys' fees and expenses, (iii) all other fees, expenses, bank fees, costs, and other charges owed to the Heritage Lenders, and (iv) post-judgment interest as provided by law.  The court ordered the appointment of a receiver on February 15, 2019.

---

[5] *See Cadence Bank, N.A., v. Heritage Sportswear, Inc.*, Case No. 1:19-cv-00595-JPB, ECF No. 1 (N.D. Ga. 2019).

85.     Cadence's net charge-off amount in Q1 2019 was $550,000—suggesting that Cadence did not charge-off any significant portion of the Heritage loan during Q1 2019, even despite: (i) Heritage's continued non-performance under the Heritage Loan Agreement; (ii) the fact that Cadence had to sue Heritage in an attempt to recover; (iii) the fact that a receiver had been appointed over Heritage; and (iv) Cadence's own charge-off policy, which states  "Loans within the commercial portfolio are generally evaluated for charge-off at 90 days past due, unless both well-secured and in the process of collection."  As alleged above, the Heritage loan was well over 90 days past due and was *neither* "well-secured" nor "in the process of collection."

## Marie Callender's

86.     Another troubled Cadence loan involved Perkins & Marie Callender's Holding LLC ("Marie Callenders"), which operated two family and casual dining chains with nearly 400 stores in the US, Canada, and Mexico.

87.     On or about June 26, 2015, Cadence, along with Bank of America, KeyBank National Association, and Regions Bank (collectively, the "Marie Callenders Lenders"), entered into a credit agreement with Marie Callenders.[6]  Valued in excess of $150 million, the Marie Callenders credit agreement provided, among other things: (a) $25,000,000 in aggregate principal amount of revolving commitments, including letters of credit; and (b) $127,750,000 in aggregate principal amount in a term loan facility.

88.     Starting in 2017 and continuing into 2018, Marie Callenders' financial performance deteriorated due to various factors, including, but not limited to: (i) a decline in sales across the family-dining and casual-dining industries due to decreased guest-traffic, (ii) the compounding negative impact of decreasing sales on one of Marie Callenders' material vendors, (iii) statutory increases in labor costs, and (iv) an increasingly tight labor market.[7]

89.     In July 2018, Marie Callenders failed to make scheduled payments to the Marie

---

[6] The credit agreement was subsequently amended on December 11, 2015 and again on October 20, 2016.

[7] *See In re: Perkins & Marie Callender's LLC, et al.*, Case No. 19-11743 (KG) (Bankr. D. Del. 2019), ECF No. 14 at ¶18 (Declaration of Jeffrey D. Warne in Support of Debtors' Chapter 11 Petitions and First Day Motions).

Callenders Lenders, including Cadence. The same quarter (Q3 2018), Cadence *reversed* $1,365,000 in credit loss provisions, reducing the Company's overall ACL reserve.

90. By October 2018, Marie Callenders again failed to make scheduled payments to the Marie Callenders Lenders, including Cadence. In or around the fall of 2018, Marie Callenders also failed to make certain mandatory prepayments and had committed certain other technical defaults in violation of the credit agreement with the Marie Callenders Lenders.[8] Also in October 2018, Marie Callenders engaged FTI Consulting, Inc. ("FTI") as their financial advisor to help develop and implement plans for long-term operational and financial restructuring or assist an investment banker in a sale of all or some of Marie Callenders' assets.

91. On or around December 17, 2018, the Marie Callenders Lenders entered in the first of two forbearance agreements with Marie Callenders. Pursuant to the forbearance agreement, the Marie Callenders Lenders agreed to forbear exercising their rights and remedies arising under the original credit agreement and related loan documents on account of the above described defaults. Pursuant to the terms of this forbearance agreement, Marie Callenders would continue to retain FTI and agreed to engage an investment bank to assess potential strategic alternatives.

92. For the same quarter of the above-described Q4 events, where Marie Callenders continued to fail to make payments, was in violation of other loan covenants, and entered into a forbearance agreement, Cadence's net charge-off amount was $195,000, suggesting that it did not charge-off any amount of the Marie Callendars loan. Moreover, while Cadence recorded a loss provision of $8.4 million for the quarter, none of this increased loss provision appears to relate to the Marie Callenders loan, which was by now in forbearance and had been deteriorating for the past seven (7) months. As Defendant Toalson explained it during the Company's 4Q 2018 earnings call on January 28, 2019, the majority of the Q4 2018 provision was due to new loan growth, with the remainder of the provision split between the energy portfolio and General

---

[8] *See In re: Perkins & Marie Callender's LLC, et al.*, Case No. 19-11743 (KG) (Bankr. D. Del. 2019), ECF No. 14 at ¶20 (Declaration of Jeffrey D. Warne in Support of Debtors' Chapter 11 Petitions and First Day Motions).

C&I, as well as a couple of acquired impaired loans.  Toalson explained the increased provision as follows, without mentioning any increased provision relating to a Restaurant sector loan:

> **There was a good chunk of it, almost $5 million of it, that was driven by simply the new loan growth because we did have the nice volume in the quarter.** We also, by about a similar amount, a little more than $5 million actually, increased our qualitative reserves. Really, that being, for the most part, split between our **energy portfolio** just with some of the changes in some of the energy prices as well has been kind of **general C&I** with some of the economic factors that we factor in, that we consider as qualitative. **On the specific reserves, those did go up about $4 million during the quarter, and yes, really related to the couple of nonperformers that we brought in** and then, I think, just a little bit associated with probably one that was already on specific review. And then so when you kind of factor all that in, we also had reductions in the provision related to the payoffs and then other movements within the portfolio. So it wasn't all driven by one thing.

93.     On or around January 24, 2019, Marie Callenders, with the consent and acknowledgement of Marie Callenders Lenders, retained Houlihan Lokey Capital, Inc. ("Houlihan"), an investment bank with expertise in mergers and acquisitions, recapitalization, and financial restructuring, to assist with among other things, exploring a potential sale of Marie Callenders' assets.  Houlihan engaged in a marketing process for the potential sale of all or certain of Marie Callenders' assets requiring any interested parties to submit initial non-binding indication of interest by no later than March 19, 2019.

94.     Then again on March 21, 2019, days after receiving initial letters of interest from potential buyers and just ten days prior to the close of Q1 2019, the Marie Callenders Lenders entered into yet another forbearance agreement with Marie Callenders, which set forth, among other things, certain investment banking process milestones regarding the marketing and sale of Marie Callenders' assets.

95.     At the same time, Cadence's net charge-off amount in Q1 2019 was only $550,000—suggesting that Cadence did not charge-off any significant portion of the Marie Callenders loan during Q1 2019, even despite: (i) Marie Callenders' ongoing non-performance under its credit agreement; (ii) that Marie Callendars' lenders, including Cadence, had extended multiple forbearance agreements to the borrower; and (iii) Marie Callendars' was in the process of selling off its assets at a discount.  In addition, despite the Heritage failures the same quarter,

Cadence recorded an inadequate provision to protect against Marie Callendars' significantly deteriorating credit quality. While the Company recorded an $11.2 million provision in Q1 2019, Murphy explained during the 1Q 2019 earnings call on April 29, 2019 that part of the provision was due to "loan growth" while "roughly $7 million" pertained to six (6) specific criticized or classified assets, including "2 restaurant credits, [at] a little less than $1 million". While Murphy did not specify whether Marie Callenders was among the two impaired restaurant credits that contributed to the provision, even if it *was*, "a little less than $1 million" spread over two loans was an insufficient reserve against the probable loss from the Marie Callenders credit.

96.     On August 5, 2019, Marie Callenders voluntarily filed for bankruptcy protection, its second Chapter 11 filing in eight years. *See In re: Perkins & Marie Callender's LLC, et al.*, Case No. 19-11743 (KG) (Bank. C. DE). According to a schedule of assets filed with Marie Callenders' voluntary petition, Marie Callenders owed the Marie Callenders Lenders approximately $115,098,938.11.

### Palm Healthcare Company, Inc.

97.     Palm Healthcare Company, Inc. ("Palm Healthcare") provided substance abuse and mental health treatment programs at its rehabilitation treatment centers located in Florida with its headquarters located in Delray Beach, Florida.

98.     On April 15, 2014, as amended from time to time, Fifth Third Bank, Cadence, and City National Bank ("Palm Healthcare Lenders") entered into a credit agreement with Palm Healthcare. Pursuant to the credit agreement, Palm Healthcare entered into a multiple term and revolving notes totaling approximately $50,500,000, including a term note and a revolving note to Cadence in the original principal amounts of $10,875,000 and $1,250,000, respectively, totaling approximately $12.13 million of credit commitment by Cadence. Starting in or around April 2014 and continuing thereafter, the Palm Healthcare Lenders, pursuant to the aforementioned loan documents, advanced funds to Palm Healthcare in excess of $40 million.

99.     On or about April 18, 2018, the Palm Healthcare Lenders, including Cadence, informed Palm Healthcare that certain default events under their credit agreement had previously occurred and were continuing to occur. The default letter reserved Palm Healthcare Lenders'

rights with respect to all the relevant loan documents.  The same quarter, 2Q 2018, Cadence recorded a loss provision of $1,263,000, but did not specify whether it related to Palm Healthcare, any other troubled loans, or general loan growth.

100.    Subsequently, Palm Healthcare entered in a forbearance agreement on July 12, 2018, with the Palm Healthcare Lenders with a forbearance period expiring September 30, 2018. Palm Healthcare failed to comply with the terms of this forbearance agreement prior to its expiration date.  The same quarter, 3Q 2018, Cadence *reversed* loss provisions in the amount of $1,365,000 (thereby *decreasing* its overall ACL reserve).

101.    On November 5, 2018, Palm Healthcare entered into a first amended forbearance agreement with the Palm Lenders with the new forbearance period expiring January 15, 2019. With Palm Healthcare *still* in default, the Palm Healthcare Lenders entered into a second amended forbearance agreement on February 11, 2019 with yet another new forbearance period expiring April 15, 2019.

102.    In February and March 2019, Palm Healthcare Lenders obtained appraisals for Palm Healthcare's remaining properties. The value of Palm Healthcare's real property securing Palm Healthcare's obligations was approximately $21,571,000—less than 43% of the value of the credit agreement.  Still, it appears the Cadence did not charge-off any significant portion of the credit or take an increased provision with respect to any significant amount of credit at risk in the loan to Palm Healthcare.

103.    Cadence's net charge-off amount in Q1 2019 was $550,000—suggesting that Cadence did not charge-off any significant portion of the Palm Healthcare loan during Q1 2019, even despite: (i) Palm Healthcare's ongoing non-performance under its loan agreement; and (ii) Cadence's own charge-off policy, which states  "Loans within the commercial portfolio are generally evaluated for charge-off at 90 days past due, unless both well-secured and in the process of collection."  As alleged above, the Palm Healthcare loan well over 90 days past due and was neither "well-secured" nor "in the process of collection."  Moreover, while Cadence recorded $11.2 million in provisions in Q1 2019, it did not identify any credits in the Healthcare sector as a contributor to that provision increase.  Instead, Defendant Murphy explained during

the Q1 2019 earnings call that the provision was due "in part to loan growth" and explained "I feel good about, really, the credit overall. The roughly $7 million that we added in provisions pertain to 6 credits, there were 2 energy credits, about $1.5 million; 2 restaurant credits, a little less than $1 million; and a couple of C&I credits that were in that $4.8 million range."

104.    On July 11, 2019, Palm Healthcare filed its voluntary petition for reorganization under chapter 11 of the Bankruptcy Code, entitled *In re: Palm Healthcare Company, Inc.*, Case No. 19-19156-EPK (Bank. C. S.D.Fla 2019).  According to a motion filed by Palm Healthcare on July 22, 2019 in the bankruptcy proceeding, the amount due under the Credit Agreement was in excess of $17,000,000.  During Cadence's 4Q 2019 earnings call, Defendant Murphy claimed that the Company's Energy and Healthcare loan portfolios have "experienced zero charge-offs over the last three years."

### Sheridan II

105.    Sheridan II is a collection of oil and natural gas investment funds established in 2010 with a principal focus on acquiring and exploiting a balanced portfolio of working interests in mature producing properties in onshore basins in the United States.  Sheridan II's strategy includes the application of cost-effective reinvestments, operational improvements, and enhanced recovery programs to the acquired assets.  On October 6, 2010, Sheridan II entered into three revolving credit agreements with certain lenders.  The maturity date on the revolving credit facilities is June 4, 2020, and as of September 15, 2019, approximately $66 million remained outstanding.  On December 16, 2013, Sheridan entered into three separate term loan credit agreements with certain lenders and as of September 15, 2019, approximately $543.1 million in aggregate principal remained outstanding.  Sheridan II was an SNC credit in which Cadence was a lender.

106.    Starting as early as June 2014 and continuing throughout 2016, a downturn in the commodities markets hindered Sheridan II's ability to implement their strategy described above. In March 2017, at the request of senior secured lenders, Sheridan enlisted the help of their investment banker, Evercore Group L.L.C. ("Evercore"), to begin raising additional capital. From these efforts, Sheridan II, in October 2017, raised approximately $455 million, $391

million of which consisted of new capital, through certain subordinated term loan facilities.

107.    Recognizing the need for a long-term solution, in late 2018 and early 2019 respectively, Sheridan II retained Kirkland & Ellis LLP and Evercore to explore strategic alternatives, including a comprehensive restructuring.  As of December 31, 2018, Sheridan II was in violation of the current ratio covenant under the revolving credit and term loan facilities. To avoid an event of default, on March 29, 2019, Sheridan II obtained waiver agreements with their secured credit facilities that were set to expire on May 31, 2019.  Even with these accommodations, Sheridan II was unable to service the interest obligations on their approximately $1.1 billion in funded debt.

108.    Then, in or around the first quarter of 2019, Sheridan Group, its financial advisors, and a supermajority of all classes of Sheridan's funded debt negotiated a comprehensive restructuring set forth in a restructuring support agreement ("RSA"), which was agreed to by Cadence and Sheridan's other lenders.  The RSA was entered by Sheridan II, holders of 90% of the revolving loans, holders of 100% of the term loans, and holders of 96% of the subordinated term loans.  Pursuant to the RSA and at the request of senior secured lenders, in May 2019, Sheridan II began the marketing process for a going-concern sale.  During the week of July 15, 2019, Sheridan II received eight (8) bids and were continuing negotiations at the time Sheridan II filed its voluntary petition on September 15, 2019.

109.    Then, on September 15, 2019, Sheridan II filed its voluntary petition for reorganization under chapter 11 of the Bankruptcy Code, entitled *In re: Sheridan Holding Company II, LLC, et al.*, Case No 19-35198 (MI) (Bank. C. Tex. 2019).  In its petition, Sheridan II outlined its restructuring plan based on the terms of the RSA.  The restructuring plan contemplated an elimination of approximately $900 million of Sheridan II's funded debt.

**Former Employees Provide Probative Evidence of Cadence's Lack of Adequate Internal Controls to Monitor and Respond to Risk, as wells as Increasing Credit Risk Concerns that Went Unaddressed During the Class Period**

110.    Former Employee #1 ("FE1") was a Senior Operational Risk Officer at Cadence Bank in Birmingham, Alabama, from January 2018 through November 2018.  FE1 was hired specifically to work on the Company's responses to "MRAs" (Matters Requiring Attention),

which are corrective action notices issued by Cadence's regulators. When FE1 was hired in January 2018, Cadence had several MRAs already outstanding and unresolved. In addition to responding to MRAs, FE1's work included identifying gaps and performing gap analyses in the software systems used by Cadence in order to identify areas of risk, including credit risk. FE1 stated that there were several areas exposing Cadence to risk, in both the deposit and commercial lending functions of the Company. FE1 reports that Cadence received a MRA from its regulator relating specifically to deficiencies in the Company's loan origination processes and procedures in May 2018. According to FE1, the State Bank Merger brought additional and serious credit risk problems to Cadence, and that these credit risk concerns were significant enough that there was concern that the acquisition might not close as scheduled (at the end of December 2018).

111.    FE1 describes a culture of delay and obfuscation of problems relating to the Company's loan portfolios. According to FE1, following Cadence's receipt of the MRA relating to loan origination in May 2018, the Company delayed correcting the underlying loan origination problems and delayed examination of the issues by the Company's external auditors, as well as state and federal regulators. FE1 reported that FE1 reported credit risk review and management problems FE1 identified during FE1's tenure to the Company's Director of Enterprise Risk Management ("ERM"). FE1 also reported that FE1 escalated the reporting of these credit risk management problems to an Audit Executive of the Company. Following FE1's attempt to escalate the concerns regarding the state of the Company's loan portfolios, FE1 was told by the Director of ERM to not discuss those problems with the Audit Executive. FE1 noted that people, like FE1, who reported similar issues, including problems relating to credit risk management, were dismissed. Ultimately FE1 reported the unaddressed concerns to Cadence's regulators.

112.    FE1 stated FE1's belief that the credit risk management problems and deficiencies that FE1 observed during 2018, which the Company knew about but did not address, related directly to the eventual bad loan charge-offs and need for increased provisions at the Company in 2019.

113.    FE1 further reported that during the time of FE1's employment at Cadence, the Company needed to replace its loan origination system. Cadence began the process of replacing

its loan origination system while FE1 was there but, on information and belief, FE1 believes that the new system still is not fully implemented.

### Regulation S-K Required Defendants to Disclose the Inadequacy of Reserves and Deteriorating Credit Quality in Cadence's Loan Portfolio

114.     Regulation S-K required Defendants to describe, in Cadence's financial statements filed with the SEC during the Class Period, "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."   17 C.F.R. § 229.303(a)(3)(ii) ("Item 303").

115.     Known as Management Discussion and Analysis ("MD&A") requirements, Item 303 is intended to provide "in one section of a filing, material historical and prospective textual disclosure enabling investors and other users to assess the financial condition and results of operations of the registrant, with particular emphasis on the registrant's prospects for the future." SEC Release Nos. 33-8056; 34-34-45321. Moreover, "Disclosure is *mandatory* where there is a known trend or uncertainty that is reasonably likely to have a material effect on the registrant's financial condition or results of operations." *Id.*

116.     Item 303 imposes an affirmative duty on issuers to disclose "known trends or any known demands, commitments, events or uncertainties that will result in or that are reasonably likely to result in the registrant's liquidity increasing or decreasing in a material way." S.E.C. Release No. 6835, 1989 WL 1092885, at *4; *see also* 17 C.F.R. § 229.303(a)(3). "Disclosure of known trends or uncertainties that the registrant reasonably expects will have a material impact on net sales, revenues, or income from continuing operations is also required. *Id.*

117.     Pursuant to Item 303(a), for a fiscal year, a registrant thus has an affirmative duty to:

     i.     Describe any *unusual or infrequent events or transactions* or any significant economic changes that materially affected the amount of reported income from continuing operations and, in each case, indicate the extent to which the income was so affected.

     ii.     Describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable

impact on net sales or revenues or income from continuing operations. If the registrant knows of events that will cause a material change in the relationship between costs and revenues (such as known future increases in costs of labor or materials or price increases or inventory adjustments), the change in the relationship shall be disclosed.

17 C.F.R. § 229.303(a)(3)(i)-(ii) (emphasis added); *see also* S.E.C. Release No. 6835, 1989 WL 1092885, at *8 (May 18, 1989) ("Other non-recurring items should be discussed as unusual or infrequent events or transactions that materially affected the amount of reported income from continuing operations.") (citation and quotation omitted).

118.   Thus, even a one-time event, if "reasonably expect[ed]" to have a material impact of results, must be disclosed. Examples of such *required* disclosures include: "[a] reduction in the registrant's product prices; erosion in the r[e]gistrant's market share; changes in insurance coverage; or the likely non-renewal of a material contract." S.E.C. Release No. 6835, 1989 WL 1092885, at *4 (May 18, 1989).

119.   Accordingly, as the SEC has repeatedly emphasized, the "specific provisions in Item 303 [as set forth above] require disclosure of forward-looking information." *See Mgmt's Discussion and Analysis of Fin. Condition and Results of Operation*, S.E.C. Release No. 6835, 1989 WL 1092885, at *3 (May 18, 1989).

120.   Indeed, the SEC has stated that disclosure requirements under Item 303 are "intended to give the investor an opportunity to look at the company through the eyes of management by providing both a short and long-term analysis of the business of the company" and "a historical and prospective analysis of the registrant's financial condition . . . with particular emphasis on the registrant's prospects for the future."  S.E.C. Release No. 6835, 1989 WL 1092885, at *3, *17. Thus, "material forward-looking information regarding known material trends and uncertainties is required to be disclosed as part of the required discussion of those matters and the analysis of their effects." *See Comm'n Guidance Regarding Mgmt's Discussion and Analysis of Fin. Condition and Results of Operations*, S.E.C. Release No. 8350, 2003 WL 22996757, at *11 (December 19, 2003).

121.   Here, the inadequacy of Cadence's ACL and the deteriorating credit quality of Cadence's loan portfolio during the Class Period, and the related need for increased charge-offs

and loss provisions, was a known trend or uncertainty likely to have a material unfavorable impact on Cadence's net revenues or income. As such, Cadence was required to include specific disclosures regarding the same in its MD&A in SEC filings during the Class Period. It did not.

### Materially False and Misleading Statements Issued During the Class Period

122.   As alleged herein, Defendants: (1) reported materially misleading financial results, including net income, ACL, provisions, and charge-offs; (2) misrepresented the Company's overall asset quality and credit risk; (3) materially misrepresented the sufficiency of Cadence's reserves; (4) materially misrepresented the adequacy of the Company's internal controls over financial reporting, in particular, its failure to monitor and adequately respond to credit risk; (5) made misleading risk disclosures; and (6) made materially misleading and incomplete Management Discussion and Analysis ("MD&A") statements that failed to disclose material trends and uncertainties, in violation of Item 303.

123.   The Class Period begins on July 23, 2018, when Cadence announced its second quarter 2018 financial results in a press release and Form 8-K, signed by Defendant Toalson. The Form 8-K and press release stated, in part:

Highlights:

- Second quarter of 2018 net income was $48.0 million, representing an increase of $9.1 million, or 23.6%, compared to the first quarter of 2018 and an increase of $19.0 million, or 65.6%, compared to second quarter of 2017.

* * *

- Loans were $9.0 billion as of June 30, 2018, an increase of $328.8 million, or 3.8%, as compared to $8.6 billion at March 31, 2018, and an increase of $1.3 billion, or 16.3%, as compared to $7.7 billion at June 30, 2017.

- Core deposits (total deposits excluding brokered) were $8.7 billion as of June 30, 2018, up $451.1 million, or 5.5%, from March 31, 2018, and up $1.5 billion, or 20.8%, from June 30, 2017.

- Total revenue for the second quarter of 2018 was $120.1 million, up 3.4% from the linked quarter and up 13.9% from the same period in 2017 driven by strong loan, core deposit, and spread income growth due to a favorably positioned, asset-sensitive balance sheet benefiting from rising short-term rates.

* * *

**Asset Quality:**

*Credit quality* metrics reflected continued improvement in the energy portfolio and general credit stability in the second quarter of 2018.

- Net-charge offs for the quarter ended June 30, 2018 were $2.2 million, compared to $0.4 million for the three months ended March 31, 2018 and $1.8 million for the three months ended June 30, 2017. Annualized net-charge offs as a percent of average loans for the quarter ended June 30, 2018 were 0.10%, compared to 0.06%, for the full year of 2017. Total second quarter 2018 charge-offs of $3.7 million and recoveries of $1.5 million were primarily due to two seasoned energy credits that have been in active resolution.

\* \* \*

- The allowance for credit losses ("ACL") was $90.6 million, or 1.01% of total loans, as of June 30, 2018, as compared to $91.5 million, or 1.06% of total loans, as of March 31, 2018 and $93.2 million, or 1.21% of total loans, as of June 30, 2017. The year-over-year decline in the ACL as a percentage of total loans resulted primarily from the reduction in non-performing loans and related valuation reserves (largely from the energy portfolio) and improved environmental factors in the energy sector over the past year.

124.    The July 23, 2018 press release also recorded a provision for credit losses of $1,263,000, which was debited against interest income. The press release and Form 8-K further touted the Company's "Solid Credit Quality" and "overall asset quality improvement" and stated that the Company's ACL of $90.6 million reflected "stable credit quality trends[.]"

125.    In an earnings call held the same day, Defendants boasted of strong loan growth and improved credit health in the Company's C&I portfolio.  Murphy stated "we're pleased to report another quarter of strong organic growth and record earnings" and "we've seen credit improve this quarter."  Toalson echoed that the Company's asset yield increase was "driven by strong new loan growth[.]"

126.    The above statements were materially false or misleading, and failed to disclose material adverse facts about Cadence's business and operations.  Specifically, the reported 2Q 2018 financial results were misleading because: (1) Cadence lacked adequate internal controls to assess and respond to credit risk and, as a result, the Company's loan portfolios presented an undisclosed increased risk of loss; (2) that, as a result, Cadence was reasonably likely to incur significant losses for certain loans; (3) the Company had inadequate credit reserves and recorded

insufficient loss provisions; (4) the Company under-reported and delayed charge-offs of bad loans; and/or (5) that the foregoing constituted a material trend or uncertainty reasonably expected to have a material adverse impact on Cadence's financial results.   In addition, Defendants' positive statements touting Cadence's supposedly "solid" and "stable" credit quality and "strong" loan growth were false and/or misleading as to the true state of the Company's loan portfolio in light of facts known to Defendants regarding the Company's deteriorating credit quality, delayed charge-offs, and inadequacy of reserves during the Class Period.

127.   On August 13, 2018, the Company filed its quarterly report on Form 10-Q for the period ended June 30, 2018 ("2Q 2018 Form 10-Q"), affirming the previously reported financial results. The financial results reported in the 2Q 2018 Form 10-Q were false and misleading for the same reasons set forth in ¶126, *supra*.

128.   In addition, the 2Q 2018 Form 10-Q included a materially misleading Management Discussion and Analysis of Financial Condition and Results of Operations ("MD&A").   The MD&A section was misleading because, in violation of Item 303, Cadence failed to disclose that it had inadequate credit reserves and recorded insufficient loss provisions during the Class Period, which inadequate reserves constituted a material trend or uncertainty reasonably expected to have a material adverse impact on Cadence's financial results.[9]

129.   The 2Q 2018 Form 10-Q also contained materially misleading assurances of the Company's internal controls over financial reporting, in particular regarding the setting of credit loss reserves.  The 2Q 2018 Form 10-Q stated that "The ACL is management's estimate of credit losses inherent in the loan portfolio at the balance sheet date. ***The Company has an established process to determine the adequacy of the ACL that assesses the losses inherent in our portfolio***" and misleadingly assured that "The ACL process involves ***procedures that appropriately consider the unique risk characteristics of the loan portfolio segments*** based on

---

[9] Management's MD&A discussion remained unchanged in the Company's 3Q 2018 Form 10-Q, 1Q 2019 Form 10-Q, 2Q 2019 Form 10-Q, 3Q 2019 Form 10-Q, and the 2018 Form 10-K. These statements are false and misleading for the same reasons as set forth in ¶128.

management's assessment of the underlying risks and cash flows."[10]

130.   Toalson and Murphy also signed false and misleading certifications pursuant to Section 302 of Sarbanes-Oxley Act of 2002 ("SOX certifications") attesting that the Company's internal controls over financial reporting were adequately designed to assure "the reliability of financial reporting" and that they had disclosed any "significant deficiencies and material weaknesses" in controls over financial reporting.  *See* 3Q 2018 Form 10-Q.[11]

131.   The above quoted statements regarding internal controls were false and misleading because they misrepresented the true state of Cadence's internal controls over financial reporting and failed to disclose that the Company, in fact, lacked adequate internal controls to "appropriately" assess and respond to credit risk and, as a result, the Company's loan portfolios presented an undisclosed increased risk of loss.  The failure to maintain adequate internal controls further rendered Cadence's financial reporting materially misleading during the Class period because the lack of controls enabled Defendants to delay charge-offs, record insufficient provisions, and maintain an insufficient ACL to reserve against losses.

132.   On October 22, 2018, the Company announced its third quarter 2018 financial results in a press release and Form 8-K, signed by Defendant Toalson, stating in part:

Highlights:

- Third quarter of 2018 net income was $47.1 million, representing strong overall business performance and an increase of $14.5 million, or 44.5%, compared to third quarter of 2017, and a decrease of $0.8 million, or 1.7% compared to the second quarter of 2018 due to second quarter's income being impacted favorably by non-routine items[(2)] including the gain on sale of the insurance subsidiary and a discrete tax deduction.

---

[10] The same statements regarding internal controls relating to "appropriately" assessing risk and setting the ACL appear in the Company's 3Q 2018 Form 10-Q, 1Q 2019 Form 10-Q, 2Q 2019 Form 10-Q, 3Q 2019 Form 10-Q, and the 2018 Form 10-K.  These statements are false and misleading for the same reasons as set forth in ¶131.

[11] The 2Q 2018 Form 10-Q appears to be lacking SOX certifications by the Individual Defendants or any other Cadence executive.  However, the Individual Defendants' 3Q 2018 SOX certifications attesting to the adequacy of internal controls over financial reporting are repeated in the Company's 1Q 2019 Form 10-Q, 2Q 2019 Form 10-Q, 3Q 2019 Form 10-Q, and the 2018 Form 10-K, in which Murphy and Toalson also attested that "the Company's internal control over financial reporting is effective."  These statements are false and misleading for the same reasons as set forth in ¶131.

* * *

- Cadence continued to demonstrate its strong business development with loan growth ending the quarter at $9.4 billion as of September 30, 2018, an increase of $1.4 billion, or 17.6%, since September 30, 2017, and an increase of $468.1 million, or 5.2%, since June 30, 2018.

- Core deposits (total deposits excluding brokered) reflected solid growth at $8.8 billion as of September 30, 2018, up $1.2 billion, or 15.0%, from September 30, 2017, and up $252.2 million, or 2.9%, from June 30, 2018. Brokered deposits decreased $97.8 million or 11.9% from September 30, 2017 and decreased $25.0 million from June 30, 2018.

- Credit remained solid during the quarter, and *loan loss provisions included a reversal of ($1.4) million for the third quarter of 2018* as compared to a provision of $1.7 million in the prior year's quarter and $1.3 million in the linked quarter. Continued improvement in the energy sector and that impact on the performance of our energy credits affected the loan provision reversal in the third quarter of 2018, as well as, refinement of our portfolio loss rates amid an overall stable credit backdrop. These combined factors more than offset loan provisions associated with the third quarter net loan growth.

### Asset Quality:

*Credit quality* reflected continued improvement in the energy portfolio and environment, as well as overall credit stability in the third quarter of 2018.

· Net-charge offs for the quarter ended September 30, 2018 were $3.1 million, $0.2 million for the three months ended September 30, 2017, and compared to $2.2 million for the three months ended June 30, 2018. Annualized net-charge offs as a percent of average loans for the quarter ended September 30, 2018 were 0.13%, compared to 0.06% for the full year of 2017. Year-to-date 2018 annualized net-charge offs were 0.09%. Total third quarter 2018 charge-offs of $3.3 million were primarily due to one seasoned energy credit that has been in active resolution and was previously reserved for the full amount of the charge-off.

* * *

· The allowance for credit losses ("ACL") was $86.2 million, or 0.91% of total loans, as of September 30, 2018, as compared to $94.8 million, or 1.18% of total loans, as of September 30, 2017, $90.6 million, or 1.01% of total loans, as of June 30, 2018. *The declines in the ACL as a percentage of total loans and the related negative loan provision in the third quarter of 2018 resulted overall stable credit*, continued improvement in the energy sector, as well as refinements of our portfolio loss rates. These factors more than offset loan provisions associated with the third quarter net loan growth.

133.   In the press release and Form 8-K, Cadence again claimed that "Our asset quality

and credit metrics remain solid" and again further boasted of the Company's "Solid Credit Quality" and "robust loan growth." The Company further misleadingly claimed that "Continued improvement in the energy portfolio and environment, as well as refinement of our portfolio loss rates and ***overall credit stability drove a provision release of $1.4 million*….*"

134.    Defendants also held an earnings call regarding the 3Q 2018 results on October 22, 2018, in which they further touted the Company's supposedly "solid" loan growth and "stable" asset quality. Defendant Murphy opened the call by explicitly attempting to assure investors about the supposed health of the Company's loan portfolios: "Our ***key focus is always on credit***. And just as a reminder, we have low levels of authority in the field. We rely on a centralized credit approval process that I would describe as thorough and rigorous. We have a dual risk rating system that's considered best practice in the industry. ***We require extensive due diligence prior to the time a loan is made and during the time the loan is outstanding***. This philosophy flows throughout the bank from the board to the senior management team and to relationship managers. So in summary, I'd say ***we maintain a rigorous process of disciplined underwriting***, and we are not sacrificing on structure or term for the sake of growth."

135.    The above statements were materially false anor misleading, and failed to disclose material adverse facts about Cadence's business and operations. Specifically, the reported 3Q 2018 financial results were misleading because: (1) Cadence lacked adequate internal controls to assess and respond to credit risk and, as a result, the Company's loan portfolios presented an undisclosed increased risk of loss; (2) that, as a result, Cadence was reasonably likely to incur significant losses for certain loans; (3) the Company had inadequate credit reserves and recorded insufficient loss provisions; (4) the Company under-reported and delayed charge-offs of bad loans; and/or (5) that the foregoing constituted a material trend or uncertainty reasonably expected to have a material adverse impact on Cadence's financial results. In addition, Defendants' positive statements touting Cadence's supposedly "solid" credit quality and "overall credit stability", its "extensive due diligence" and "rigorous process of disciplined underwriting," and "robust loan growth" were false and/or misleading as to the true state of the Company's loan portfolio in light of facts known to Defendants regarding the Company's deteriorating credit

quality and inadequacy of reserves during the Class Period.

136. On November 14, 2018, the Company filed its quarterly report on Form 10-Q for the period ended September 30, 2018 ("3Q 2018 Form 10-Q"), affirming the previously reported financial results. The financial results reported in the 3Q 2018 Form 10-Q were false and misleading for the same reasons set forth in ¶135, *supra*.

137. On January 28, 2019, the Company announced its full year fiscal 2018 financial results in a press release and Form 8-K signed by Defendant Toalson, stating, in part:

Highlights:

- 2018 net income was $166.3 million, up meaningfully from $102.4 million for 2017. Fourth quarter of 2018 net income was $32.3 million, an increase of $17.6 million compared to fourth quarter of 2017, representing strong overall business performance, and a decrease of $14.8 million compared to the third quarter of 2018 due to non-routine expenses[2] and increased loan loss provisions in the fourth quarter of 2018. Adjusted net income was $174.8 million[1] for 2018, up from $123.3 million for 2017. Fourth quarter of 2018 adjusted net income was $41.5 million[1], an increase of $5.2 million compared to the fourth quarter of 2017 and a decrease of $7.8 million compared to the third quarter of 2018 due to increased loan provisions in the fourth quarter of 2018.

\* \* \*

- *Credit remains solid*, with net charge-offs of six basis points for both 2018 and 2017, and 1 basis point in the fourth quarter of 2018.

\* \* \*

**Asset Quality:**

*Credit quality* reflected continued overall credit stability in the loan portfolio, with net charge-offs as a percent of average loans remaining very low during the year at 0.06% for both 2018 and 2017.

- For the quarter ended December 31, 2018, net charge-offs were $0.2 million, compared to $2.7 million and $3.1 million for the quarters ended December 31, 2017 and September 30, 2018, respectively.

\* \* \*

- The allowance for credit losses ("ACL") was $94.4 million, or 0.94% of total loans, as of December 31, 2018, as compared to $87.6 million, or 1.06% of total loans, as of December 31, 2017, $86.2 million, or 0.91% of total loans, as of September 30, 2018.

- Loan loss provision was $12.7 million for 2018 compared to $9.7 million for 2017. The increase resulted primarily from robust loan growth in 2018.  Loan loss provision was $8.4 million for the fourth quarter of 2018 as compared to reversals of ($4.5) million in the prior year's quarter and ($1.4) million in the linked quarter.

138.    In the press release and Form 8-K, Cadence again touted "continued overall credit stability in the loan portfolio," "Steady Credit Quality," and "Robust Loan Growth."  During the earnings call held the same day, Defendant Murphy also assured investors that "The credit quality and the risk rate of [the State Bank] portfolio is similar to our overall loan portfolio" and that "credit quality at State has been outstanding throughout the year."

139.    The above statements were materially false and/or misleading, and failed to disclose material adverse facts about Cadence's business and operations.   Specifically, the reported year-end 2018 financial results were misleading because: (1) Cadence lacked adequate internal controls to assess and respond to credit risk and, as a result, the Company's loan portfolios presented an undisclosed increased risk of loss; (2) that, as a result, Cadence was reasonably likely to incur significant losses for certain loans; (3) the Company had inadequate credit reserves and recorded insufficient loss provisions; (4) the Company under-reported and delayed charge-offs of bad loans; and/or (5) that the foregoing constituted a material trend or uncertainty reasonably expected to have a material adverse impact on Cadence's financial results.  In addition, Defendants' positive statements touting Cadence's supposedly "solid" credit quality, including the credit quality of loans acquired from State Bank, were false and/or misleading as to the true state of the Company's loan portfolio in light of facts known to Defendants regarding the Company's deteriorating credit quality and inadequacy of reserves during the Class Period.

140.    On March 1, 2019, the Company filed its annual report on Form 10-K for the period ended December 31, 2018 (the "2018 Form 10-K"), affirming the previously reported financial results. The year-end 2018 financial results were false and misleading for the same reasons set forth in ¶139, *supra*.

141.    Under "Risk Factors," regarding managing credit risks, Cadence stated, in part:

***Our business depends on our ability to successfully manage credit risk.***

Our business depends on our ability to successfully measure and manage credit risk. As a lender, we are exposed to the risk that the principal of, or interest on, a loan will not be repaid timely or at all or that the value of any collateral supporting a loan will be insufficient to cover our outstanding exposure. In addition, we are exposed to risks with respect to the period of time over which the loan may be repaid, risks relating to proper loan underwriting, risks resulting from changes in economic and industry conditions, and risks inherent in dealing with individual loans and borrowers. The creditworthiness of a borrower is affected by many factors including local market conditions and general economic conditions. If the overall economic climate in the United States, generally, or our market areas, specifically, experiences material disruption, our borrowers may experience difficulties in repaying their loans, the collateral we hold may decrease in value or become illiquid, and the level of nonperforming loans, charge-offs and delinquencies could rise and require significant additional provisions for credit losses. Additional factors related to the credit quality of commercial loans include the quality of the management of the business and the borrower's ability both to properly evaluate changes in the supply and demand characteristics affecting our market for products and services and to effectively respond to those changes. Additional factors related to the credit quality of commercial real estate loans include tenant vacancy rates and the quality of management of the property.

Our risk management practices, such as monitoring the concentration of our loans within specific industries and our credit approval, review and administrative practices, may not adequately reduce credit risk, and our credit administration personnel, policies and procedures may not adequately adapt to changes in economic or any other conditions affecting customers and the quality of the loan portfolio. Many of our loans are made to small and medium-sized businesses that are less able to withstand competitive, economic and financial pressures than larger borrowers. Consequently, we may have significant exposure if any of these borrowers becomes unable to pay their loan obligations as a result of economic or market conditions, or personal circumstances, such as divorce or death. A failure to effectively measure and limit the credit risk associated with our loan portfolio may result in loan defaults, foreclosures and additional charge-offs, and may necessitate that we significantly increase our allowance for credit losses ("ACL"), each of which could adversely affect our net income. As a result, our inability to successfully manage credit risk could have a material adverse effect on our business, financial condition and results of operations.

142.    Regarding reserves and potential losses to the loan portfolio, the 2018 Form 10-K stated, in part:

> ***Our ACL may prove to be insufficient to absorb potential losses in our loan portfolio, which may adversely affect our business, financial condition and results of operations.***
>
> As a lender, we are exposed to the risk that our customers will be unable to repay their loans in accordance with their terms and that any collateral securing the payment of their loans may not be sufficient to assure repayment. Credit losses

are inherent in the business of making loans and could have a material adverse effect on our operating results. We have established our ACL and maintain it at a level considered adequate by management to absorb probable credit losses based on our analysis of the quality of our loan portfolio, market environment and other factors we deem to be relevant to this analysis. The ACL represents our estimate of probable losses in the portfolio at each balance sheet date and is based upon relevant information available to us. The allowance contains provisions for probable losses that have been identified relating to specific borrowing relationships, as well as probable losses inherent in the loan portfolio and credit undertakings that are not specifically identified. Additions to the ACL, which are charged to earnings through the provision for credit losses, are determined based on a variety of factors, including an analysis of the loan portfolio, historical loss experience and an evaluation of current economic conditions in our market areas. The determination of the appropriate level of the ACL inherently involves a high degree of subjectivity and requires us to make significant estimates of current credit risks and future trends, all of which may undergo material changes. Although our management has established an ACL it believes is adequate to absorb probable and reasonably estimable losses in our loan portfolio, the allowance may not be adequate. We could sustain credit losses that are significantly higher than the amount of our ACL. Higher credit losses could arise for a variety of reasons, including changes in economic, operating and other conditions within our markets, as well as changes in the financial condition, cash flows, and operations of our borrowers.

As of December 31, 2018, our ACL as a percentage of total loans was 0.94% and as a percentage of total nonperforming loans was 127.12%. Additional credit losses will likely occur in the future and may occur at a rate greater than we have previously experienced. We may be required to take additional provisions for credit losses in the future to further supplement the ACL, either due to management's decision to do so or requirements by our banking regulators. In addition, bank regulatory agencies will periodically review our ACL, the policies and procedures we use to determine the level of the allowance and the value attributed to nonperforming loans or to real estate acquired through foreclosure. Such regulatory agencies may require us to recognize future charge-offs. In addition, in June 2016, the Financial Accounting Standards Board issued a new accounting standard, Current Expected Credit Losses ("CECL"), that will replace the current approach under generally accepted accounting principles (GAAP) for establishing allowances for credit losses, which generally considers only past event and current conditions. CECL is a forward-looking methodology that reflects the expected credit losses over the lives of financial assets, starting when such assets are first acquired. Under the revised methodology, credit losses will be measured based on past events, current conditions and reasonable and supportable forecasts that affect the collectability of financial assets. The standard is expected to result in increases to allowance levels generally and will require the application of the revised methodology to existing financial assets through a one-time adjustment to retained earnings upon initial effectiveness. The standard will be effective for us in 2020. See "Notes to Consolidated Financial Statements—Note 1—Summary of Accounting Policies—Pending Accounting Pronouncements" for

additional information about the standard. Any increases in the ACL will result in a decrease in net income and, if the increases reduce retained earnings and capital, it could have a material adverse effect on our business, financial condition and results of operations.

143.    The foregoing risk warnings were materially false and misleading because they omitted material facts known to Defendants by this time in March 2019 regarding increasing credit risk in the Company's loan portfolios, as well as the inadequacy of reserves and provisions.   By March 2019, Defendants knew or recklessly disregarded that the Company's ACL likely *would* prove to be insufficient to absorb probable losses in Cadence's loan portfolio, which likely *would* adversely affect its business, financial condition and results of operations. Likewise, as alleged herein, by this time in March 2019, Defendants knew or recklessly disregarded that Cadence was *not* successfully managing its credit risk; instead, deteriorating credit was recklessly extended or ignored, charge-offs were delayed, and provisions and ACL were insufficient.

144.    On April 29, 2019, the Company announced its first quarter 2019 financial results in a press release and Form 8-K, signed by Defendant Toalson, stating in part:

Highlights

- Adjusted net income[1], excluding non-routine income and expenses[2] primarily related to the merger, was $75.0 million for the first quarter of 2019, an increase of $33.0 million or 79% compared to the first quarter of 2018 and an increase of $33.5 million or 81% compared to the fourth quarter of 2018.

- Adjusted EPS[1] for the first quarter of 2019 of $0.57 increased $0.07 compared to adjusted EPS for both the prior year and linked quarters of $0.50.

145.    The above statements were materially false or misleading, and failed to disclose material adverse facts about Cadence's business and operations.   Specifically, the reported 1Q 2019 financial results were misleading because: (1) Cadence lacked adequate internal controls to assess and respond to credit risk and, as a result, the Company's loan portfolios presented an undisclosed increased risk of loss; (2) that, as a result, Cadence was reasonably likely to incur significant losses for certain loans; (3) the Company had inadequate credit reserves and recorded insufficient loss provisions; (4) the Company under-reported and delayed charge-offs of bad loans; and/or (5) that the foregoing constituted a material trend or uncertainty reasonably

expected to have a material adverse impact on Cadence's financial results.

146.     In the April 29, 2019 press release and Form 8-K, Defendants continued to assure investors that "*Credit quality* reflected *continued overall credit stability* in the loan portfolio." During the earnings call held the same day, Defendants attempted to allay any concern over the increased provision expense. Defendant Murphy stated: "The provision was a bit larger than planned for the quarter at $11 million. The increase is *due in part to loan growth* and what I would say is *prudent specific reserves for certain criticized or classified assets*. Even with the increase in provision, overall, it's still a good quarter from a credit perspective."

147.     When another analyst inquired about the need for additional provisions on State Bank acquired loans, Defendant Murphy specifically assured him that the State Bank loans were not a concern:

> BRETT D. RABATIN, SENIOR RESEARCH ANALYST, PIPER JAFFRAY COMPANIES, RESEARCH DIVISION: I wanted to ask, just on the loan portfolio that you've acquired. Sometimes we see the duration of the portfolios be fairly short, then you have to make pretty sizable provisions on the acquired book as those loans are renewed. Can you talk about that and just maybe expectations for provisioning relative to the acquired book over the next year?

> PAUL B. MURPHY: Yes, Brett, we feel like that their *credit results at State were really good*. In due diligence, we liked what we saw. *In fact, the reason it didn't take much of a mark is because they were pretty conservative in their accounting for the portfolio as it was. And I would say now that we've kind of lived together for most of the last 9 months and seeing how they manage credit and originate credit, my expectation would be that additional provisions would be normal or ordinary or kind of in line*.

> Significantly, Defendant Toalson added that: "*the vast majority of the loans that we acquired from State Bank are noncredit-impaired category*."

148.     Defendants' positive statements touting Cadence's supposedly "stable" credit quality and "continued overall credit stability" were false and/or misleading as to the true state of the Company's loan portfolio in light of facts known to Defendants regarding the Company's deteriorating credit quality and inadequacy of reserves during the Class Period.  Moreover, Murphy's statement that the provision was "due in part to loan growth and what I would say is prudent specific reserves for certain criticized or classified assets" was misleading to the extent that it misrepresented the amount of the provision, which was in fact insufficient to reserve

against the mounting risks in Cadence's loan portfolio, as "prudent" thus suggesting it was sufficient to cover all then probable losses capable of being reasonably estimated when it was not.

149.   On May 2, 2019, Cadence hosted its first ever Analyst Day, during which Defendants continued to misleadingly tout Cadence's supposedly outstanding credit quality. Defendants claimed that Cadence, unlike its peers, employed "credit discipline," "proven underwriting criteria," and "strong monitoring of credit,"  and that as a result, the Company's "[c]redit quality is strong."

150.   Defendants tried desperately to assure the market of credit quality, specifically trying to allay investors' likely concerns about credit quality in the wake of the significant loan portfolio growth Cadence had experienced since going public.  Defendant Murphy explained:

> We're going to go ***deep, deep into our credit discipline and our underwriting***, and we recognize that this is something that for many investors is a question mark. They look at us and say fast loan growth means questionable credit quality down the road. I understand. That's a fair question. And ***I hope that by the end of the day today, you will see it as I do and feel as comfortable as I feel about where we are with our credit underwriting*** and the performance of our team.

151.   Defendant Murphy further assured the market that "the way we manage risk, the way we've constructed these portfolios, the way we've built the policies and the credit selection and the monitoring is something that will serve us well in future recessions or downturns of any type.  And so what you'll see is that the risk control environment, risk infrastructure that we have is built for probably a larger regional bank."  Murphy went so far as to hope for a recession so that he could prove the strength of Cadence's underwriting and the credit quality of the Company's loan portfolios, commenting that "I'm sort of hoping for a recession so we can go through that and perform well and have everyone see that 'I guess what Murphy said all along has proven up.'"

152.   David Black, Cadence's Executive Vice President and Chief Risk Officer (who had formerly served as the Chief Credit Officer of State Bank), went on to assure investors as to the "***conservative***" approach of the Company's lending practices.  Steve Prichett, Cadence's Division Head of Technology Banking, closed his remarks by emphasizing: "As we move into

2019, here's what I'd like to remember: ***Credit quality is strong***; ***credit quality is strong***, and we continue to see meaningful growth for a strong pipeline."  And Daniel Holland, Cadence's Executive Vice President and Head of Restaurant Banking, assured analysts that "***our reserves are adequate*** based on what we know today."

153.    The foregoing statements about Cadence's credit quality, credit risk management, and reserve adequacy are false and misleading because: (1) Cadence lacked adequate internal controls to assess and respond to credit risk and, as a result, the Company's loan portfolios presented an undisclosed increased risk of loss; (2) that, as a result, Cadence was reasonably likely to incur significant losses for certain loans; (3) the Company had inadequate credit reserves and recorded insufficient loss provisions; (4) the Company under-reported and delayed charge-offs of bad loans; and/or (5) that the foregoing constituted a material trend or uncertainty reasonably expected to have a material adverse impact on Cadence's financial results.

154.    On May 10, 2019, the Company filed its quarterly report on Form 10-Q for the period ended March 31, 2019, affirming the previously reported financial results.  The financial results reported in the 1Q 2019 Form 10-Q were false and misleading for the same reasons set forth in ¶145, *supra*.

### The Truth Begins To Unfold Through A Serious of Partial, Yet Still Misleading, Disclosures

155.    On July 22, 2019, the Company disclosed that "higher credit costs including net charge-offs of $18.6 million and loan provisions of $28.9 million" negatively impacted its second quarter 2019 financial results. In a press release and Form 8-K signed by Defendant Toalson, the Company stated, in relevant part:

> Cadence Bancorporation (NYSE:CADE) ("Cadence") today announced net income for the quarter ended June 30, 2019 of $48.3 million, or $0.37 per diluted common share ("per share"), compared to $48.0 million or $0.57 per share for the quarter ended June 30, 2018, and $58.2 million or $0.44 per share for the quarter ended March 31, 2019. The first and second quarters of 2019 included merger related expenses of $22.0 million or $0.13 per share and $4.6 million or $0.03 per share, respectively.
>
> "The results for second quarter of 2019 reflect continued organic loan and deposit growth and solid fundamental trends, that were unfortunately negatively impacted

by higher credit costs including net charge-offs of $18.6 million and loan provisions of $28.9 million.

\* \* \*

Adjusted Performance Metrics:

- Adjusted net income[1], excluding non-routine income and expenses[2] primarily related to the merger, was $51.5 million for the second quarter of 2019, an increase of $9.3 million or 22.2% compared to the second quarter of 2018 and a decrease of $24.0 million or 31.8% compared to the first quarter of 2019.

- Adjusted EPS[1] for the second quarter of 2019 of $0.40 decreased by $0.10 compared to adjusted EPS for the prior year quarter of $0.50 and decreased by $0.18 for the linked quarter of $0.58.

156.    On this news, the Company's stock price fell $3.75 per share, or over 19%, to close at $15.86 per share on July 22, 2019, thereby injuring investors.   Still, Defendants misleadingly assured investors as to credit quality and the adequacy of Cadence's ACL going forward, thereby continuing to artificially inflate the Company's share price.

157.    While analysts and investors were shocked and concerned by the charge-offs and need for increased loss provisions, Defendants immediately (and misleadingly) attempted to allay those concerns.   Defendant Murphy opened the 2Q 2019 earnings call by explaining that the $19 million in charge-offs flowed only from four bad loans, and assuring investors "There's no correlation on these 4 credits, and *we don't view this as systemic*."

158.    Steven Alexopolous of JP Morgan Chase & Co. noted during the earnings call that "To start, surprise, on credit, if we look at the increase in non-performers and net charge-offs, *the market's clearly concerned this is systematic*."   Defendant Murphy responded by misleadingly assuring that the problems were not systematic; rather they were limited and isolated, relating to only a handful of credits.   He stated that the charge-offs and increased non-performers were "just a bit of bad luck" and stated "[w]e've got a bad quarter here," but falsely reassured that his view of Cadence's credits was "unchanged" and that "our credit underwriting at Cadence is good[.]"

> PAUL B. MURPHY: Yes. Steve, let me try to walk you through at a high level here. The first credit that we took a charge on in the quarter is a 40-year-old business. It's 2 well-known private equity firms sponsored the acquisition of this

business several years ago. They went through a major expansion period that was not effective and had a management team change-out. Initially, the private equity firms were supportive and put some more money in, but couldn't get comfortable with the kind of go-forward projections from the new management team, and have elected to put the -- basically the business up for sale. And so -- it's not a SNC by the way, this first one. And so we kind of take a look at the operating performance of the company and the fact that they're going through a sales process, we thought the accounting treatment of taking a charge on that was appropriate.

Credit #2, different industry, great private equity firm, we've done 6 or 7 deals with, all successful, except this one. This is a SNC, the agent, by the way, has done a fantastic job. And this company went through some major margin contraction in their business, just due to new competition, and decided to sell the business. And that has been done, and the marks on this one are based on the final resolution of the sale of the business, which I think funds here just in the next 2 or 3 days. So really hats off to the agent on that one.

Company 3 is a supply chain management business. They lost their major vendor and sort of turned their business inside out several years ago. They have gone through a restructuring, hired a new management team. And this mark is a result of the ASC 310, just the accounting process that you go through looking at their operating performance. Again, they're showing some improvement within their results, but it's a very stressed company.

Credit #4 is a restaurant deal, and by the way, the first 2 are Houston deals, the third deal is a Birmingham deal, and deal #4 is an Atlanta deal, it's a restaurant company that is going through the sale of their business, and that may or may not be in or out of bankruptcy and mark seemed appropriate there.

Turning to the 3 new non-performers. The first one is just an orderly liquidation of an inventory of a company whose business line changed. And based on new appraisals, we believe we are adequately secure there. That will wind down over a period of several months, it will take some time.

Credit #2 is an energy credit. That is in bankruptcy because of the sub-debt. We believe our senior secure position is in a good collateral position. And then -- and that's a SNC, by the way.

And then credit #3, a restaurant SNC, is a company that management team is continuing to support the business, including putting cash in. But they have multiple concepts, one of which is doing really great, and they're going through a sale process. And a mark on that one seemed to be prudent. So as you might expect, I'd much rather talk about the best loans we've ever made, but it is my view that ***these are not correlated, unique sets of facts. Just a little bit of bad luck coming on the heels of the Investor Day, but my view of credit really unchanged. Our credit underwriting at Cadence is good.*** We've got a bad quarter here, but all in, still pretty confident with where we are.

159.    Analyst Brett Rabatin of Piper Jaffray pressed: "back on credit. Just thinking about the linked quarter increase in criticized loans and these lumpy credits that you're having

that are not related. Can you give us some color on how you're thinking about provisioning the back half of the year and then what -- basically if you've taken the provision you needed for all the stuff that happened in terms of 2Q?"  Defendant Murphy again misleadingly reassured the market that: "based on what we know today, *all of the appropriate provisions that should have been taken have been taken*."

160.    Analysts were not satisfied with Defendants responses and pressed further.  In response, Defendants continued to obfuscate and misrepresent the sufficiency of the Company's provision and reserves.  Jon Arfstrom of RBC Capital Markets pressed:

> And then maybe Valerie, back on the provision outlook. Can you help us a little more on that? Do you feel, other than just for growth, do you feel like you need to continue building reserves?
>
> Or do you feel like the next quarter's provision will come back down to the range it's been in the past?
>
> VALERIE C. TOALSON: Yes. So again, just kind of reiterating what Paul noted earlier, it's very much a quarter-to-quarter assessment process. And careful evaluation of the individual credits for impairment, and when you do the valuations of those, look at the grading movements within the quarter, positive or negative, it's volumes. I mean, it's – it's – we're very consistent, I would say, in the application of our -- on balance, and so it will be treated on a consistent basis. Probably that's not what you're looking for, but that's...
>
> JON GLENN ARFSTROM: Not at all, really. We're just trying -- *you understand what's going on here. Your stock isn't doing well on the call either. So we're just trying to figure out if 7 credits went sideways in one quarter, and it's going to clear up in the next quarter is what we're trying to figure out.*
>
> VALERIE C. TOALSON: *Well, and I think Paul mentioned that <u>we wouldn't expect to have this level of charge-offs in the near future, by any means</u>.*

161.    The 2Q 2019 financial results and the foregoing statements assuring the market of the adequacy of the Company's loss reserves and assurances that the loans resulting in the charge-offs and provisions were one-offs were materially false and misleading because: (1) Cadence lacked adequate internal controls to assess and respond to credit risk and, as a result, the Company's loan portfolios presented an undisclosed increased risk of loss; (2) that, as a result, Cadence was reasonably likely to incur significant losses for certain loans; (3) the Company still had inadequate credit reserves and recorded insufficient loss provisions to reserve against likely

additional loan losses; and (4) the Company under-reported and delayed charge-offs of bad loans.

162.    In addition, Defendants cited what they characterized as "general credit migration"—downgrading of a loan based on deteriorating credit quality—as a cause of the increased provision.   In the face of specific analyst concerns, Defendants continued to misleadingly downplay the severity of the problem:

> KENNETH ALLEN ZERBE, EXECUTIVE DIRECTOR, MORGAN STANLEY, RESEARCH DIVISION: Great. I guess just staying with credits. *You had a comment in your press release that basically said you increased your provision expense due to general credit migration in your C&I portfolio. Now Paul, you are very clear that these credits were very unique and not systematic. But I guess I'm just, love some clarity around the "general credit migration"* comment that you had?
>
> PAUL B. MURPHY: Yes. Ken, I think it just goes back to we did see *some additional downgrades in the quarter* and that is taken into consideration when we're doing our reserve allocation.
>
> KENNETH ALLEN ZERBE: And these additional downgrades, were they in addition to the 3 non-performers and the 4 charge-offs? This is extra or additional stuff?
>
> VALERIE C. TOALSON: Ken, this is Valerie. Yes. Basically, the majority of the reserves that we took relates to the specific analyses, ASC 310s, that would include the loans that are categorized as nonperforming. That's probably $20 million of it right there. The rest is really just related to a combination of loan growth, loan payoffs, migration, with the majority of that difference, really over 2/3 of that, being migration within the pass category versus downgrades significantly.
>
> PAUL B. MURPHY: So if the credit goes from a 5 to a 6, it's going to take a lot more provision.
>
> VALERIE C. TOALSON: Right.
>
> PAUL B. MURPHY: *Every quarter*. So that -- there would be...
>
> KENNETH ALLEN ZERBE: Got it. Understood. I just want to clarify because you -- as far as I recall, I think *you're the only bank that's actually mentioned general credit migration in their portfolio*.

163.    The foregoing explanation of credit migration in Cadence's loan portfolios as "some additional downgrades" was false and misleading because it grossly understated the extent

of deteriorating credit quality that the Company was actually grappling with, and the amount of additional charge-offs and provisions that needed to be taken.

164.    Ultimately, however, analysts were convinced by Defendants' strong assurances. JP Morgan wrote in a July 23, 2019 report that: "we see the keys for the stock to make up some of the lost ground as being (1) credit quality pressure being contained to 2Q19 and (2) NIM performing in-line with expectations provided on the 2Q19 earnings call. *In other words, no additional negative surprises. To this end, we found the commentary on the call convincing that while the company did see several NPAs as well as several NCOs pressure 2Q results, these appear to be idiosyncratic and* <u>*not indicative of broader pressure mounting on the loan portfolio*</u>."  Based on management's assurances, JP Morgan thus retained its "Overweight" rating (*i.e.*, the stock was seen as a better value for the money than others).

165.    Given Defendants' assurances that the loan problems resulting in the Q2 2019 charge-offs and loss provisions were "unique" and "not systematic" investors were thus stunned on October 23, 2019, when the Company disclosed that "higher credit costs including net charge-offs of $18.6 million and loan provisions of $28.9 million" negatively impacted its second quarter 2019 financial results. In a press release and Form 8-K signed by Defendant Toalson, the Company stated, in relevant part:

> *for the second quarter in a row, we incurred elevated charge-offs and higher provisions, primarily driven by a small number of existing nonperforming credits that experienced further deterioration*. More broadly, *the underlying fundamentals for our borrowers and our business remain strong*, and we remain confident in our strategy and ability to generate sustainable attractive long-term returns," stated Paul B. Murphy, Jr., Chairman and Chief Executive Officer of Cadence Bancorporation.

> <u>**Adjusted Performance Metrics**</u>:

> • Adjusted net income, excluding non-routine income and expenses, was $44.2 million for the third quarter of 2019, a decrease of $5.1 million or 10.4% compared to the third quarter of 2018 and a decrease of $7.3 million or 14.2% compared to the second quarter of 2019, primarily due to the higher provision for credit losses in the current quarter.

> • Adjusted pre-tax pre-provision net earnings increased in the third quarter of 2019 to $100.8 million, an increase of $37.7 million or 59.9% compared to the third quarter of 2018 and an increase of $4.7 million, or 4.9% compared to the

second quarter of 2019.

• Adjusted EPS for the third quarter of 2019 of $0.34 decreased from the prior year quarter of $0.58 and from the linked quarter of $0.40.

166.     On this news, the Company's stock price fell $2.23 per share, or over 13%, to close at $15.74 per share on October 23, 2019, thereby injuring investors.  Still, Defendants misleadingly assured investors as to credit quality and the adequacy of Cadence's ACL going forward, thereby continuing to artificially inflate the Company's share price.

167.     Analysts were again concerned about credit quality and the sufficiency of reserve levels, and Defendants again misleadingly downplayed and allayed those concerns.  Again, Defendants tried to downplay the credit problems as relating to only a handful of loans as opposed a larger concern of credit deterioration.  Defendant Murphy stated:

> Now turning to our third quarter results as many of you have seen in our press release, we experienced another quarter of elevated charge-offs, and we've taken provisions higher as a result of some pressure we're seeing in ***certain pockets of our portfolio***. I think it's significant to note that ***the predominance of our elevated credit calls stand from a few loans that hit us really hard [as] opposed to a broad-based deterioration***.

> In the third quarter, charge-offs totaled $31 million, and provision was $44 million.

> Of the $31 million in charge-offs in the quarter, $15 million came from one non-SNC C&I credit. Of the $50 million charge-offs year-to-date, $20 million was from the same C&I non-SNC loan. This credit resulted in a very high severity of loss driven by a complex set of reasons which we'll talk more about in a moment.

168.     In addition to the $15 million non-SNC C&I credit charge-off, the Company charged off another $3 million non-SNC C&I, $4.4 million restaurant SNC, $5.3 million energy SNC, approximately $1.9 million spread over commercial real estate, consumer, and small business, and the remaining $1.7 million net charge-off was allocated to C&I without specification.  Murphy went on to assure investors that "we are confident that our reserves for these [C&I] credits reflect the risk accurately."

169.     Regarding the $43.8 million provision, Defendants explained that approximately half of that amount was due to the increased NCOs and the other half was due to deteriorating credit quality in the Company's C&I loan portfolios, specifically General C&I and Energy

sectors.   Defendant Murphy stated that: "we have had an uptick in criticized and classifieds assets. This drove approximately half of our loan loss provision for the third quarter. These increases were primarily from General C&I and Energy."  Still, Murphy assured investors that "I think that *the increase in criticized and classifieds are not terribly alarming, and they would not generate outsized provisions or charge-offs in the future*. I think it's more ordinary course of business…."

170.     Defendant Toalson further assured that, again, the events leading to the increased charge-offs and provision for 3Q 2018 were isolated: "About half of our loan provisions this quarter were associated with the credits that we charged-off, and those loans are either resolved or in the process of resolution, and *we believe that the reserves are established for those they are last and final. And so, that's a big chunk of the provisioning this quarter that we don't anticipate having a go-forward aspect to it*."

171.     Regarding the restaurant credit charge-off, Samuel Tortorici (Cadence President) admitted that "[t]he *restaurant charge-off has been a long identified problem for the past several quarters*. It was a bankruptcy situation, and we've got it fully resolved for the quarter." Still, he toed the Company line and went on to reassure investors as to the overall adequacy of reserves: "In terms of other material losses in the book, I think *we've got the book graded appropriately*."

172.     Both Toalson and Murphy continued to deflect and dismiss credit deterioration concerns, insisting they had sufficiently "scrubbed" the portfolio to identify all present risks, as analysts pressed on the apparent ongoing deterioration in the portfolio:

> STEVEN A. ALEXOPOULOS: Okay. And then, just from a big picture view, I mean *credit is not an issue really anywhere else, but you're seeing credit -- negative credit migration again this quarter? Did you guys change anything internally? Is there a scrubbing of the portfolio, something that's causing these problems to come to the surface now?*
>
> PAUL B. MURPHY: No, Steve. I mean, we *every quarter go through the portfolio and scrub it* and look for changes and this is a period where more than average number of credits were (inaudible) [as plus] .
>
> VALERIE TOALSON; EXECUTIVE VICE PRESIDENT: Steve, I would also just follow-up on the larger credit that Paul mentioned, *we have done -- really a*

*scrub of portfolio evaluating and feel comfortable that there are no other credits that have the makeup of that [one large] credit* and so again, believe that it is somewhat unique in its characteristics and unique in its loss severity.

STEVEN A. ALEXOPOULOS: Okay. *I guess every shareholder on this call really wants to know one thing, is this it in terms of the negative credit migration or is this now going to become a quarterly event where we're reporting problems coming out of leveraged, problems coming out of restaurant*. How do you think about that? Is this going to become a recurring event going forward?

PAUL B. MURPHY: Well. Steve, I guess what I'm thinking about is that over time, the returns on our portfolio are going to be attractive. On a quarter-over-quarter basis, it can be lumpy, *this one outlier credit is not something – the severity of loss on that is not something that we would expect to experience again, and the vast majority of the bank's loan portfolio is performing great. It's really sort of an isolated thing*, but there is stress in restaurant, and we're watching how to leverage that moderating portfolio like a hawk and looking for every opportunity to improve the risk profile there. So I think next year's going to be a much better year for credit.

173.    The foregoing 3Q 2018 financial results and Defendants' statements assuring the market of the adequacy of the Company's loss reserves and that the loans resulting in the charge-offs and provisions were one-offs were materially false and misleading because: (1) Cadence lacked adequate internal controls to assess and respond to credit risk and, as a result, the Company's loan portfolios presented an undisclosed increased risk of loss; (2) that, as a result, Cadence was reasonably likely to incur significant losses for certain loans; (3) the Company still had inadequate credit reserves and recorded insufficient loss provisions to reserve against likely additional loan losses; and (4) the Company under-reported and delayed charge-offs of bad loans.

174.    Following Cadence's October 23, 2018 announcement, JP Morgan suggested concern that a significant portion of the net charge-off of $15 million related to a "*previously* identified" problem loan:

rather than third quarter results confirming that pressure on credit quality was largely contained to the prior quarter, current quarter results were worse than expected on several fronts including (1) a much sharper write-down being taken on problem loans that were *previously* identified, (2) continued negative credit migration into potential problem loans (criticized and classified) and (3) with growth now expected to be flat/down in several challenged portfolios, loan growth was dialed down to a mid-single digits pace for 2020.

(emphasis in original).

175.   Morgan Stanley echoed the concern that a significant portion of the total NCO related to a loan *previously* identified as impaired, yet also acknowledged Defendants' attempts to assuage investors' concerns:

> ***Of its total net charge-offs of $31.3 mil, roughly half or $15.0 mil related to one specific general C&I credit that deteriorated further since last quarter (the same loan they took a $5 mil loss on in 2Q19)***. The other problem credits consisted of a $3.0 mil non-SNC C&I credit, a $5.3 mil energy SNC, and a $4.4 mil restaurant SNC. As they did last quarter, ***management did their best to assure investors that this quarter's weakness was not indicative of the trends in its broader credit portfolio, but much more isolated events***.

176.   In a November 1, 2019 report, BuySellSignals observed that Cadence's market cap had decreased by 33.1% over two years, compared with the S&P 500 Index which rose 18.9% over the past two years.

177.   Once again, despite Defendants' repeated assurances that the Q3 2019 charge-offs and increased provisions were one-offs, Cadence revealed heightened charge-offs and provisions again for the fourth quarter of 2019.  On January 23, 2020, the Company issued a press release and Form 8-K announcing 4Q 2019 financial results, signed by Defendant Toalson, stating in relevant part:

> **Asset Quality:**
> Credit quality metrics were elevated during 2019 as certain of our borrowers, predominantly in the Restaurant, Energy, and General C&I categories, experienced increased credit stress compared to our historical experience and long-term expectations.
>
> Provision for credit losses for the full year 2019 was $111.0 million or 0.81% annualized of average loans as compared to $12.7 million or 0.14%
>
> annualized of average loans for 2018. Provision for the fourth quarter of 2019 was $27.1 million or 0.80% annualized of average loans as compared to $8.4 million or 0.34% annualized of average loans for the fourth quarter of 2018 and $43.8 million or 1.27% annualized of average loans for the third quarter of 2019. The current quarter's provision was driven primarily by higher charge-offs and specific reserves.
>
> • Net charge-offs for the full year 2019 were $85.8 million or 0.63% annualized of average loans as compared to $5.9 million or 0.06% annualized for the full year 2018. For the fourth quarter 2019, net charge-offs were $35.3 million or 1.04% annualized of average loans compared to $0.2 million or 0.01% annualized and

$31.3 million or 0.91% annualized for the quarters ended December 31, 2018 and September 30, 2019, respectively. The current quarter charge-offs included $15.0 million in five restaurant credits, $7.7 million in three general C&I credits, $7.5 million in three energy credits and $4.3 million in three acquired credits.

• The allowance for credit losses ("ACL") was $119.6 million or 0.92% of total loans as of December 31, 2019, as compared to $94.4 million or 0.94% of total loans as of December 31, 2018, and $127.8 million or 0.94% of total loans as of September 30, 2019.

• The ACL to total nonperforming loans was 100.1% as of December 31, 2019, as compared to 127.1% as of December 31, 2018, and 118.2% as of September 30, 2019.

• Loans 30-89 days past due were 0.17% of total loans at December 31, 2019, compared to 0.06% at December 31, 2018 and 0.15% at September 30, 2019.

• Nonperforming loans ("NPL") as a percent of total loans were 0.92% at December 31, 2019, compared to 0.74% at December 31, 2018 and 0.79% at

September 30, 2019. NPL totaled $119.6 million, $74.2 million and $108.1 million as of December 31, 2019, December 31, 2018 and September 30, 2019, respectively.

• Total criticized loans (see Table 6) at December 31, 2019 were $605.1 million or 4.66% of total loans as compared to $259.9 million or 2.58% at December 31, 2018 and $571.9 million or 4.19% at September 30, 2019. The linked quarter increases included migration of certain general C&I credits.

178.    On this news, the Company's stock price fell $1.31 per share, or over 7%, to close at $16.34 per share on January 23, 2020, thereby further injuring investors.

179.    In an analyst report dated January 27, 2020, JP Morgan noted that "rather than the charge-offs during the quarter contained to a specific industry, they were instead spread across a total of 14 credits within the restaurant, general C&I, energy, and acquired loan portfolios as Cadence continues to see negative credit migration into various lending segments."  JP Morgan concluded that "with the company's credit risk profile remaining elevated and the growth profile appearing to slow in 2020, we see the current discount valuation as appropriate."

## ADDITIONAL SCIENTER ALLEGATIONS

### Access to Information and Active Oversight of Credit Risk Management

180.    As alleged herein, Defendants acted with scienter since Defendants knew that the public documents and statements issued or disseminated in the name of the Company were

materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Cadence, their control over, and/or receipt and/or modification of Cadence's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Cadence, participated in the fraudulent scheme alleged herein.

181.    Cadence claimed to have exhaustively monitored credit risk.  The Company stated in its Q1 2017 Form 10-Q, and reiterated in all Form 10-Qs filed during the Class Period, that: "Credit risk is governed and reported up to the Board of Directors primarily through our Senior Credit Risk Management Committee. The Senior Credit Risk Management Committee reviews credit portfolio management information such as problem loans, delinquencies, concentrations of credit, asset quality trends, portfolio analysis, policy updates and changes, and other relevant information. Further, both Senior Loan Committee and Credit Transition Committee, the primary channels for credit approvals, report up through Senior Credit Risk Management Committee. The Senior Loan Committee generally approves all loans with relationship exposure greater than $5 million.  Dual signature authority between the business unit and the credit officer is utilized for loan approvals below the $5 million threshold. Additionally, the Credit Transition Committee manages all material credit actions for classified credits greater than $5 million."  During the Company's May 2019 analyst day, Cadence explained that the Senior Credit Risk Management Committee meets monthly, the Senior Loan Committee meets twice weekly, and the Credit Transition Committee meets at least quarterly.

182.    The Senior Credit Risk Management Committee members include, among others: Defendant Murphy, Samuel Tortorici as CEO of Cadence Bank N.A., Teresa Hemphill as Chief Credit Administration Executive, and Steve Barnhart as Chief Credit Underwriting Executive. The Senior Loan Committee members include, among others: Defendant Murphy, Samuel

Tortorici as CEO of Cadence Bank N.A., Hank Holmes as President of Cadence Bank and Executive Vice President of Cadence Bancorporation, Steve Barnhart as Chief Credit Underwriting Executive, and the Chief Administrative Executive.[12]   The Credit Transition Committee members include, among others: Teresa Hemphill as Chief Credit Administration Executive, and the Chief Administrative Executive.

183.    According to the Company's May 2, 2019 Investor Day presentation, "detailed credit risk portfolio reporting [is] reviewed monthly by [Cadence's] Chairman, CEO, President, CRO, and other executives."

184.    Defendant Murphy touted his active involvement and oversight in managing the Company's credit risk.  He told analysts and investors during the May 2, 2019 corporate analyst meeting that "our credit risk management is overseen by a very capable team of credit professionals, active involvement from myself and Sam [Tortorici], Hank [Holmes]."

185.    Samuel M. Tortorici is President of Defendant Cadence Bancorporation and CEO of Cadence Bank.  Since July 2011, Mr. Tortorici has overseen three acquisitions with Cadence, including the State Bank Merger.  As CEO of Cadence Bank, Mr. Tortorici oversees the business lines and support functions.  Mr. Tortorici is based in the Company's Birmingham, Alabama, location.

186.    Hank Holmes is based in the Company's Houston, Texas, location and serves as President of Cadence Bank and Executive Vice President of Cadence Bancorporation.  Mr. Holmes also serves as Business Services Executive and President, Texas Region of Cadence Bank.  Mr. Holmes oversee nearly $3 billion in loan activity among eight lending groups—C&I, Middle Market Commercial, Commercial RE, Energy, Community Banking, and Private Banking.  Mr. Holmes is also a member of Cadence Bank's Senior Management Committee and Senior Loan Committee.

187.    Toalson, meanwhile, is an experienced financial executive, having previously served for seven years as the CFO of another bank, and prior to that serving in bank Controller,

---

[12] Plaintiffs were unable to locate the name of the individual that occupies this position during the Class Period or otherwise.

Credit Services, and Chief Auditor roles.  As a financial officer with extensive experience in banking and commercial lending.  Toalson is astutely experienced in GAAP provisions that relate to loan loss reserves, charge-offs, and managing and assessing credit risk.

188.    Toalson and Murphy also signed SOX certifications attesting that the Company's internal controls over financial reporting were adequately designed to assure "the reliability of financial reporting," that they had disclosed any "significant deficiencies and material weaknesses" in controls over financial reporting, and that "the Company's internal control over financial reporting is effective."

189.    Finally, Defendant Murphy was a member at all relevant times of the Risk Management Committee of Cadence's Board of Directors.  According to the Committee's charter, its purpose is to provide assistance to the Board in fulfilling its oversight of: (i) the Company's risk governance structure, (ii) the Company's risk management and risk assessment guidelines and policies regarding market, credit, operation, liquidity, funding, reputational, regulatory and such other risks as necessary to fulfill the Committee's duties and responsibilities, (iii) the Company's risk tolerance, (iv) the Company's capital, liquidity and funding, and (v) the performance of the Company's Enterprise Risk Management Executive; thus ensuring that there is in place an effective system reasonably designed to evaluate and control such risk throughout the Company. Some of the Committee's responsibilities include, among other things, to: "Review and approve, at least annually, the Company's overall risk governance structure, risk management and assessment guidelines, and the risk management policies and procedures"; "Review and approve, at least annually, the policies for ERM, Financial Crimes Risk Management, Credit Review, and Compliance units. Certain additional policies and procedures as recommended by the ERM Executive may also be submitted for consideration and approval"; and "Review the Company's implementation of, and compliance with, risk management policies and procedures, including whether they are being followed and are effective, and any significant risk management failures as well as management's responses."

## **Corporate Scienter**

190.    Each of the Individual Defendants was a high-ranking management-level

employee.  The scienter of each of the Individual Defendants and of all other management-level employees of Cadence, including each high-ranking officer or director, is imputable to the Company. The knowledge of each of these individuals should therefore be imputed to Cadence for the purposes of assessing corporate scienter.

191.    Even aside from the scienter of the Individual Defendants, the facts alleged herein raise a strong inference of corporate scienter as to Cadence as an entity. Corporate scienter may be alleged independent of individual defendants where a statement is made or approved by a corporate official sufficiently knowledgeable about the company to know the statement was false or misleading. Here, the statements alleged were made to the investing public regarding the Company's operations, finances, business practices, credit quality, and loss reserves—all important topics that would necessarily require approval by appropriate corporate officers who, as alleged, had very different information in their hands at the time from what was disclosed to investors.

192.    Cadence stated that the Senior Credit Risk Management Committee governs and reports on credit risk to the Board of Directors of the Company.  The Senior Credit Risk Management Committee is responsible for reviewing and reporting credit portfolio management information such as problem loans, delinquencies, concentrations of credit, asset quality trends, portfolio analysis, policy updates and changes, and other relevant information to the Board of Directors.  On information and belief, Defendant Murphy, Sam Tortorici, Hank Holmes, David Black, and Steve Barnhart served on the Senior Credit Risk Management Committee during the Class Period.  The actions, knowledge, or recklessness of each of these individuals, in stating or affirming the statements alleged herein, is properly imputed to Cadence.

## **Insider Trading**

193.    Defendants Murphy and Toalson reaped substantial proceeds from sales of their Cadence stock holdings at artificially inflated prices during the Class Period.

194.    From the time Cadence went public in 2017 through the beginning of the Class Period, Defendant Murphy did not sell any shares, but during that time he acquired 577,522 shares—the *vast majority* of which were given to Defendant Murphy in connection with his

compensation package (he purchased 2,500 shares in the Company's 2017 IPO).  On September 14, 2018, Defendant Murphy sold 275,000 shares of Cadence stock at an inflated price of $27.41 per share for gross proceeds of $7,537,750.  He has not sold any of his Cadence stock holdings since.  Shortly after he dumped nearly half of his holdings on unwitting investors at an inflated price, he assured the market that "shareholders who stick with us will be pleased in the long run."[13]

195.   Defendant Toalson likewise did not sell any shares from the time Cadence went public in 2017 through the beginning of the Class Period, but during that time she acquired 36,600 shares—the vast majority of which were given to Defendant Toalson in connection with her compensation package (she purchased 1,033 shares in the Company's 2017 IPO).  Then after the start of the Class Period, on September 14, 2018, Defendant Toalson sold 25,160 shares of Cadence stock (68.7% of her holdings) at an inflated price of $27.41 per share on September 14, 2018, reaping gross proceeds of $689,636.  She has not sold any of her Cadence stock holdings since.

196.   Like Defendants Murphy and Toalson, Sam Tortorici did not sell any shares between the time of Cadence's 2017 IPO through the beginning of the Class Period, but during that time he acquired 119,602 shares—the vast majority of which were given to Mr. Tortorici in connection with his compensation package (he purchased 10,750 shares in the Company's 2017 IPO).  On September 14, 2018, Mr. Tortorici sold 100,943 shares of his Cadence stock (84% of his holdings) at an inflated price of $27.41 per share for gross proceeds of $2,766,848, reducing his position in the Company by approximately 84%.  He has not sold any of his Cadence stock holdings since.

197.   David Black acquired 48,921 shares of Cadence stock in connection with the State Bank Merger when he became Cadence's Chief Risk Officer.  He subsequently acquired an additional 3,264 shares at $19.30 per share on April 1, 2019.  On May 2, 2019, during Analyst Day, and alongside Murphy, Toalson and Tortorici, Mr. Black hyped the market helping to pump

---

[13] October 22, 2018 earnings call transcript.

up Cadence's stock price with repeated assurances of the credit quality of Cadence's loan portfolio. On May 14, 2019—less than two weeks later and fewer than ten weeks before Cadence would drop its Q2 bomb—Mr. Black sold 22,500 shares of his Cadence stock (43% of his holdings) at an inflated price of $21.30 per share, reaping gross proceeds of $479,250. He has not sold any of his Cadence stock holdings since.

### One-Time Executive Bonus Payments Based on Inflated 2018 Performance

198.    On March 23, 2019, Cadence also announced in a Schedule 14A that its Compensation Committee[14] approved "one-time cash awards under the Cadence Bancorporation Executive Bonus Plan ("One-Time Bonus Plan") for 2018." The Bonus Plan, which was not part of the regular/ongoing executive compensation program, awarded the following payments:

| | |
|---|---|
| Paul Murphy | $2,000,000 |
| Valerie Toalson | $1,219,628 |
| Samuel Tortorici | $1,594,898 |
| Hank Holmes | $1,313,445 |

199.    The Compensation Committee justified its decision to award ***themselves*** millions of dollars in bonuses in large part by citing Cadence's supposedly "exceptional year" with "reported record performance results" and the need to "ensure that [Cadence's] senior leadership team remains strong, stable, and focused on aggressive growth and operational efficiency goals that will drive [] future success." In fact, Defendants (including, in particular, the Individual Defendants on the Compensation Committee) had created the *artifice* of an "exceptional year" with "record performance results" by delaying charge-offs and provisions on bad loans and under-reserving for deteriorating credit across its growing loan portfolios throughout 2018—and then rewarded themselves handsomely for the same.

### Annual Executive Bonus Payments Based on Inflated 2018 Performance

200.    On March 23, 2019, Cadence also announced the results of its annual cash incentive program which "links executive decision-making and performance" with the Company's annual strategic objectives ("Annual Bonus Plan").

---

[14]The Compensation Committee was made up of the following executive officers: Defendant Murphy, Defendant Toalson, Samuel Tortorici, Hank Holmes, and Jerry Powell.

201.    The Compensation Committee establishes threshold, goal and above goal performance levels and weights for each selected performance objective under the Annual Bonus Plan.  The amount of each named executive officer's potential incentive payment is based on a percentage of that officer's base salary.

| Performance | Goal Attainment | Payout Factor |
|-------------|-----------------|---------------|
| Below Threshold | <70% | 0% |
| Threshold | 70% | 25% |
| Goal | 100% | 100% |
| Above Goal | 120% | 150% |

202.    For the 2018 fiscal year, the Compensation Committee selected the following weighting for each executive for the various performance objectives:

| Name | Corporate Net Income | Individual Objectives[15] | Line of Business Revenue, Growth | Line of Business Efficiency |
|------|----------------------|---------------------------|----------------------------------|-----------------------------|
| Paul Murphy | 75% | 25% | | |
| Valerie Toalson | 75% | 25% | | |
| Samuel M. Tortorici | 75% | 25% | | |
| Hank Holmes | 60% | 15% | 25% | |
| Jerry W. Powell | 50% | 20% | | 30% |

203.    In accordance with the parameters set forth by the Compensation Committee, the corporate goal for the adjusted net income was $157.09 million and the Company's performance was $175.26 million, which equals 111.6% of the target.  Based on 2018 net income that was inflated by Defendants' actions as alleged herein, Defendants Murphy and Toalson, Mr. Tortorici, and Mr. Holmes, all attained 100% of the net income target for their individual objectives.  Indeed, this supposed achievement was accomplished only by Defendants' actions which artificially inflating the Company's net income, including intentionally slowing the "migration" of loans and delaying charge-offs, in order to avoid recording additional provision expense throughout 2018  The percentage awarded to each named executive officer for each goal and the payments under the Annual Bonus Plan are outlined in the following table:

---

[15] Individual objectives include individual performance measures relating to transparency in board reporting, overall organizational leadership, maintaining satisfactory relationship with regulators, and overall goals within their direct reporting units.

| Name | Corporate Net Income % | Individual Objectives (%) | Line of Business Revenue and Growth (%) | Line of Business Efficiency | Percentage of Goal Incentive Payment (%) | Actual Incentive Payment ($) |
|---|---|---|---|---|---|---|
| Paul Murphy | 96.7% | 25.0% | | | 121.7% | $1,110,373 |
| Valerie Toalson | 96.7% | 25.0% | | | 121.7% | $456,318 |
| Samuel Tortorici | 96.7% | 25.0% | | | 121.7% | $547,581 |
| Hank Holmes | 77.4% | 15.0% | 32.9% | | 125.3% | $501,015 |
| Jerry W. Powell | 64.5% | 35.5% | | 22.8% | 122.8% | $175,000 |

## CLASS ACTION ALLEGATIONS

204.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased or otherwise acquired Cadence securities between July 23, 2018 and January 23, 2020, inclusive, and who were damaged thereby (the "Class").   Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

205.    The members of the Class are so numerous that joinder of all members is impracticable.   Throughout the Class Period, Cadence's common shares actively traded on the NYSE.   While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are at least hundreds or thousands of members in the proposed Class.   Millions of Cadence Class A common stock were traded publicly during the Class Period on the NYSE.   Record owners and other members of the Class may be identified from records maintained by Cadence or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

206.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of

federal law that is complained of herein.

207.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

208.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

   a.    whether the federal securities laws were violated by Defendants' acts as alleged herein;

   b.    whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Cadence; and

   c.    to what extent the members of the Class have sustained damages and the proper measure of damages.

209.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET)

210.    The market for Cadence's securities was open, well-developed and efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or failures to disclose, Cadence's securities traded at artificially inflated prices during the Class Period. On August 22, 2018, the Company's share price closed at a Class Period high of $28.85 per share. Plaintiffs and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of Cadence's securities and market information relating to Cadence, and have been damaged thereby.

211.    During the Class Period, the artificial inflation of Cadence's shares was caused by

the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiffs and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Cadence's business, prospects, and operations.  These material misstatements and/or omissions created an unrealistically positive assessment of Cadence and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company shares.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiffs and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

212.    At all relevant times, the market for Cadence's securities was an efficient market for the following reasons, among others:

a.    Cadence shares met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

b.    As a regulated issuer, Cadence filed periodic public reports with the SEC and/or the NYSE;

c.    Cadence regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

d.    Cadence was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace; and/or

e.    The average daily trading volume for Cadence securities during the Class Period was approximately 1,551,840 shares with 128,015,327 shares outstanding as of November 1, 2019, and a market capitalization reaching over $2.9 billion during

the Class Period.

213.    As a result of the foregoing, the market for Cadence's securities promptly digested current information regarding Cadence from all publicly available sources and reflected such information in Cadence's share price. Under these circumstances, all purchasers of Cadence's securities during the Class Period suffered similar injury through their purchase of Cadence's securities at artificially inflated prices and a presumption of reliance applies.

214.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## LOSS CAUSATION

215.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiffs and the Class.  During the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements and omissions about Cadence's financial well-being and prospects.  These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and/or misleading statements and omissions during the Class Period resulted in Plaintiffs and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein when the truth was revealed.

## CLAIMS FOR RELIEF

### FIRST CLAIM
**Violation of Section 10(b) of The Exchange Act and
Rule 10b-5 Promulgated Thereunder
Against All Defendants**

216.     Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

217.     During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (ii) cause Plaintiffs and other members of the Class to purchase Cadence's securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

218.     Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Cadence's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

219.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Cadence's financial well-being and prospects, as specified herein.

220.     Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Cadence's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state

material facts necessary in order to make the statements made about Cadence and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

221.    Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

222.    Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Cadence's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

223.     As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Cadence's securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiffs and the other members of the Class acquired Cadence's securities during the Class Period at artificially high prices and were damaged thereby.

224.     At the time of said misrepresentations and/or omissions, Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding the problems that Cadence was experiencing, which were not disclosed by Defendants, Plaintiffs and other members of the Class would not have purchased or otherwise acquired their Cadence securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

225.     By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

226.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

**SECOND CLAIM**
**Violation of Section 20(a) of The Exchange Act**
**Against the Individual Defendants**

227.     Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

228.     Individual Defendants acted as controlling persons of Cadence within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level

positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading. Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

229.    In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

230.    As set forth above, Cadence and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

(a)    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)    Awarding compensatory damages in favor of Plaintiffs and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)    Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in

this action, including counsel fees and expert fees; and

      (d)     Such other and further relief as the Court may deem just and proper.

## **JURY TRIAL DEMANDED**

Plaintiffs hereby demand a trial by jury.

Dated: January 31, 2020

**GLANCY PRONGAY & MURRAY LLP**

By:  *s/ Kara M. Wolke*
Kara Wolke (*pro hac vice*)
Melissa Wright (*pro hac vice*)
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone:  (310) 201-9150
Facsimile:  (310) 201-9160
Email: info@glancylaw.com

POMERANTZ LLP
Omar Jafri (*pro hac vice*)
Ten South LaSalle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile: (312) 377-1184
Email: ojafri@pomlaw.com

*Attorneys for Plaintiffs Frank Miller and Patrick Gordon*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 31, 2020, I electronically filed a true and correct copy the foregoing with the Clerk of Court using the CM/ECF system which will send a notice of electronic filing to all counsel of record who have consented to electronic notification.

<u>*/s/Kara M. Wolke*              </u>
Kara M. Wolke