UNITED STATES DISTRICT COURT            SOUTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| Frank Miller, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | Civil Action H-19-3492 |
| *versus* | § | |
| | § | |
| Cadence Bancorporation, *et al.*, | § | |
| | § | |
| Defendants. | § | |

# Opinion On Dismissal

1.      *Introduction.*

Frank Miller and Patrick Gordon are investors in Cadence Bancorporation. They bring a putative class action under Rule 10b-5 of the Securities Exchange Act of 1934 on behalf of themselves and others who acquired Cadence securities between July 23, 2018 and January 23, 2020.

Miller and Gordon allege that Valerie Toalson and Paul Murphy are control persons who violated Section 20(a) of the Exchange Act.

Cadence, Toalson, and Murphy have moved to dismiss for failure to state a claim under Federal Rules of Civil Procedure Rule 12(b)(6). They will prevail.

2.      *Background.*

A.      *Parties.*

Miller and Gordon are investors in Cadence who claim they bought Cadence securities at a falsely inflated price.

Paul Murphy and Valerie Toalson were chief executive officer and chief financial officer during the class period.

Cadence Bancorporation is a financial holding company that owns Cadence Bank, National Association. Cadence focuses on middle-market commercial lending, retail banking, and wealth management.

B.     *Stock Offerings.*

On July 24, 2018, Cadence announced a secondary offering of 12.5 million shares of Class A common stock for $28.40 per share and that offering was completed on July 26, 2018.

On September 11, 2018, another secondary offering of about 12 million shares of Class A common stock at $27.55 per share was announced.  The offering ended on September 14, 2018.

C.     *Executives' Stock Activity.*

During the September secondary offering, Murphy sold 275,000 shares of stock at $27.41 per share and Toalson sold 25,160 shares at $27.41 per share. Murphy received around $7.5 million and Toalson received around $700,000 for their shares.

In March 2019, Murphy and Toalson both purchased shares. Murphy spent about $1 million and Toalson spent about $100,000.

D.     *Increased Charge-Offs and Loss-Provisions.*

For the second, third, and fourth quarters of 2019, Cadence disclosed adjustments to the value of their loan portfolio to account for increases in credit risk. The adjustments were made through charge-offs and increases in loss-provisions. Overall, Cadence charged-off $85.2 million in the last three quarters of 2019, in contrast to a 2018 year-long total of $5.9 million.

The investors claim that Cadence, Toalson, and Murphy knowingly or recklessly made untrue statements, employed illegal accounting, and committed other fraud, leading to the putative class buying securities at falsely inflated prices.

### E.   *Acquisition.*

On January 1, 2019, Cadence absorbed the State Bank Financial Corporation, with Cadence paying about $826 million in stock for State Bank.

### 3.   *Motion to Dismiss.*

To survive a motion to dismiss, specific facts must be pleaded to make the claim for relief plausible on its face.[1] All relevant well-pleaded facts are accepted as true and are viewed in the light most favorable to the plaintiff.[2]

### 4.   *Section 10(b) and Rule 10b-5.*

The elements of a claim under Rule 10b-5 of Section 10(b) are (a) a material misrepresentation or omission; (b) scienter – a wrongful state of mind; (c) a connection with the purchase or sale of a security; (d) reliance; (e) economic loss; and (f) a causal connection between the material misrepresentation and the loss.[3] Cadence, Murphy, and Toalson argue that the complaint fails to claim an actionable material misstatement or omission and does not support a strong inference of scienter.

---

[1]   *Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp.,* 565 F.3d 200, 206 (5th Cir. 2009).

[2]   *Moffett v Bryant,* 751 F.3d 323, 325 (5th Cir. 2014).

[3]   *Owens v. Jastrow,* 789 F.3d 529, 535 (5th Cir. 2015).

5.    *Private Securities Litigation Reform Act.*

The investors must articulate the specifics that constitute fraud or mistake.[4] When private parties bring securities fraud claims, the Private Securities Litigation Reform Act requires pleadings to include who, what, when, where, and how the alleged fraud occurred, identify misleading statements, and explain why they are misleading.[5] The putative class must state facts that give rise to a strong inference that Cadence, Murphy, and Toalson acted with severe recklessness, or with a clear intent to deceive, manipulate, or defraud.

A.    *Material Misrepresentation.*

(a)    *Financial Statements and Internal Controls.*

The investors claim that Cadence, Murphy, and Toalson should have recorded increases in loss-provisions and charge-offs earlier than they did, making the allowance for credit loss inadequate.

The investors attempt to show misrepresentation in the financial statements by showing the distinct difference between financial statements preceding the second quarter of 2019 and the financial statements of the second, third, and fourth quarters of 2019.

They have a sharp difference, but a negative difference does not indicate misrepresentations earlier. It indicates only that the firm had more weak debt at the end of 2019 than it did in 2018 and in the first quarter of 2019.

The 2019 numbers – while much larger than in 2018 – were not unprecedented for Cadence, further supporting that the numbers do not indicate misrepresentation. In fact, ratios of net charge-offs to

---

[4]    FED. R. CIV. P. 9(b).

[5]    *Owens v. Jastrow*, 789 F.3d 529, 535 (5th Cir. 2015).

average loans and total loss-provisions to total loans were higher in 2016 than they were in 2019.

In addition, Cadence acquired State Bank in the first quarter of 2019. After the acquisition, charge-offs and loss provisions increased – as did income. Further, the additional reserves and charge-offs involved less than two percent of Cadence's loan portfolio and Cadence continued to have healthy profits in the quarters at issue.

(b)    *Internal Controls.*

The investors claim that Cadence's internal controls were insufficient.

In seventy-three pages, the investors never specify what about the controls were insufficient. The investors only claim that the loss-provision and charge-off increases should have happened earlier, without identifying any specific portion of Cadence's internal control policies that were not reliable.

The investors claim there were "deficiencies" in Cadence's loan origination process but do not mention what the deficiencies were. They vaguely claim there was a "culture of delay and obfuscation of problems" without pointing to anything within the internal control policies that caused the claimed delay.

Further, the investors specify that a new loan origination system was needed, and that Cadence was in the process of replacing the system. This shows that Cadence was taking appropriate actions, not that their controls were inadequate.

(c)    *Audit.*

Cadence hired Ernst & Young Global LTD. to audit it. The audit did not require a restatement, indicating that the allowance for credit loss, loss-provision, and charge-off accounting was acceptable. Ernst & Young also gave an unqualified opinion on Cadence's controls, indicating the controls in place were appropriate. The investors have

claimed no facts that suggest the court should doubt the Ernst & Young assessment.

The inapplicable and general accusations of false statements, paired with clean 2018 and 2019 audit reports, do not indicate material misrepresentation.

(d)   *Bad Loans.*

The investors cite four Cadence borrowers that filed for bankruptcy or were sued for unpaid debts, one of which was acquired in the absorption of State Bank. The complaint does not show that the increased reserves and charge-offs were a result of these borrowers, how much bad-debt accounting Cadence completed for these borrowers in the course of the loan period, or how much each borrower owed Cadence.[6] Showing signs of financial stress, without showing how that stress affects Cadence's loans, does not require lenders to increase charge-offs and disclose loans.[7]

In addition, in each of the four identified loans, Cadence is part of a coalition of lenders and must work with the other lenders. In each of the loans listed, the coalitions had not given up on the loans but were working to collect as much as possible.

Showing that these borrowers were under stress does not show misrepresentation.

---

[6]   Cadence was only responsible for portions of the loans. There are no claims about Cadence's share in two of the four relevant loans.

[7]   *Financial Acquisition Partners LP v. Blackwell,* No. 3:02-CV-1586-K, 2004 WL 2203253, at *12 (N.D. Tex. Sept. 29, 2004); *aff'd,* 440 F.3d 278, 289 (5th Cir. 2006).

(e)      *Other Statements.*

The investors claim that statements made about (a) asset quality, (b) credit risk, and (c) risk disclosures are material misrepresentations. Many of these statements are opinion statements and include language like "strong," "I believe," "I feel," "really good," and "we wouldn't expect." These are all subjective statements about an uncertain future, not present material facts. They cannot be materially false. None of the statements promises that Cadence will not face more charge-offs or provision increases in the future, and Cadence disclosed in its financial statements that these were possibilities. Some of the statements are projections of future performance and are thus inactionable.[8] The statements, individually or collectively, are not material misrepresentations.

The investors say that Cadence had to disclose any unusual or infrequent events, transactions, significant economic changes, known trends, or uncertainties that materially affected or may reasonably materially affect the income from continuing operations or revenues – reflecting the regulatory language without supplementing it with facts or logic.

Cadence did not need to disclose anything more because it disclosed the doubtful, substandard, and loss-level loans each quarter. It disclosed the amount of charge-offs and loss-provisions and some indication of the cause of the increases.

Further, a trend of increasing charge-offs and loss-provisions was not known. After three consecutive quarters of increased charge-offs and loss-provisions, a trend was evident and Cadence disclosed it in its 2019 10-K.

The increase in charge-offs and loss-provisions is distinct, but the decrease in net interest income and interest income is not material. Movement in net operating income and revenue is normal, and Cadence is not required to anticipate each movement or explain

---

[8]      *ABC Arbitrage v. Tchuruk,* 291 F.3d 336, 358-360 (5th Cir. 2002).

movements more than it already did.

The investors acknowledge that the changes in loss-provisions and charge-offs may have come, at least in part, from the acquisition of State Bank in January of 2019. What they neglect to acknowledge is that the acquisition was an overall positive event for investors. Cadence had higher interest income, net interest income, and net income in each quarter of 2019 than it did in the corresponding quarter of 2018.

In addition, the additional loss-provisions and charge-offs involved less than two percent of the portfolio.

B.     *Scienter.*

(a)     *Motivations.*

The investors claim that Cadence, Murphy, and Toalson purposely delayed recognizing charge-offs and reserves to keep stock prices high and to benefit from extra compensation. The motivation to keep stock prices high is expected, legal, and insufficient to imply scienter. Further, keeping stock prices high during the secondary stock offerings and the acquisition of State Bank would be in the interest of investors. Motivations to sell stock at favorable prices combined with motivation to raise capital and receive enhanced incentive compensation do not imply scienter.[9]

(b)     *Insider Trading.*

Insider trading claims are not enough to create a strong inference of scienter.[10] Even if they were sufficient, the investors

---

[9]     *Abrams v. Baker Hughes, Inc.*, 292 F.3d 424, 429 (5th Cir. 2002).

[10]     *Alaska Elec. Pension Fund v. Asar,* 768 Fed. App'x 175, 181 (5th Cir. 2007).

-8-

claim that Murphy and Toalson knew about the future increases in loss-provisions and charge-offs because they sold stock during the secondary offering. Executives selling shares in secondary offerings is normal and does not show fraud. Rather than showing fraud, it shows that the officers were shifting their Cadence shares into cash. The officers need to be free to liquidate their assets as desired.

Although the Murphy and Toalson had not sold Cadence stock before, the sales were eight months before the increased charge-off announcement and Murphy and Toalson also bought stock between the sales and the bad news. They also disclosed the sales to the Securities and Exchange Commission. This does not create a strong inference of scienter of fraud, but instead shows a lack of scienter.

(c)   *Anonymous Witness.*

Investors offer evidence from an anonymous, loquacious witness. This unnamed source was a senior operational risk officer in Birmingham, Alabama for eleven months. The witness left Cadence eight months before the announcement at issue and does not identify specific erroneous calculations made by a specified person. The witness lists a litany of vague, petty complaints that do not identify actionable conduct by Cadence.

These claimants cannot rely on an anonymous person's statements. Anonymity must only be used when an articulate, pressing danger to the person outweighs the public's right to open judicial proceedings.[11] Even unnamed witnesses with stronger allegations have not satisfied the strong inference of scienter requirement.[12] This witness is no exception.

---

[11]   *Southern Methodist Univ. Ass. Of Women Law Students v. Wynn & Jaffe*, 599 F.2d 707, 712-712 (5th Cir. 1979).

[12]   *Owens v. Jastrow*, 789 F.3d 529, 542-45 (5th Cir. 2015).

6.      *Conclusion.*

The case will be dismissed for failure to state a claim. The claim does not plead material misrepresentation, a strong inference of scienter, or any actionable behavior. The investors will take nothing from Cadence, Murphy, or Toalson.

Signed on August 7, 2020, at Houston, Texas.

Lynn N. Hughes
United States District Judge